STATE of Wisconsin, Plaintiff-Respondent,
v.

Douglas Arthur MIDDLETON, Defendant-
Appellant.

Court of Appeals

*No. 85–0030–CR. Submitted on briefs October 9, 1985.—Decided
November 20, 1986.*

(Also reported in 399 N.W.2d 917.)

299

300

For the defendant-appellant the cause was submitted on the briefs of *Ruth S. Downs*, assistant state public defender.

For the plaintiff-respondent the cause was submitted on the briefs of *Bronson C. La Follette*, attorney general, and *Mary Batt*, assistant attorney general.

Before Gartzke, P.J., Dykman, J., and Eich, J.

GARTZKE, P.J.   Douglas Middleton appeals from a judgment convicting him of first-degree murder, arson, and armed robbery, secs. 940.01, 943.02 and 943.32(2), Stats. Middleton argues that the trial court should have suppressed his post-arrest oral and written confessions that he killed Hilda Miller. He asserts that his statements were inadmissible because (1) he gave the statements during interrogation after he invoked his right to counsel, (2) before questioning him the interrogating detectives failed to ask whether he had counsel, and (3) he was not told that the attorney he requested was present and attempting to see him.

# I.

## SUMMARY OF ISSUES AND CONCLUSIONS

We conclude that Middleton did not invoke his right to counsel. The detectives were not required to ask whether he had retained counsel. Middleton had, however, asked his wife to call a specific attorney. Because the police knew that but did not tell Middleton the attorney had arrived during his interrogation, Middleton's statements after that time were not made with a "voluntary and knowing" waiver of his *Miranda* rights and should have been excluded. Middleton's written statements were made after the attorney arrived. Because, however, the record does not show whether Middleton's oral confessions were made after the attorney arrived, we cannot determine whether those confessions were unlawfully obtained. We must therefore reverse and remand this matter to the trial court for evidentiary findings, since resolution of this issue is essential to determining whether Middleton, by taking the stand, waived his right against self-incrimination and whether harmless error occurred.

Whether Middleton waived his right by testifying turns on the analysis mandated by *Harrison v. U.S.*, 392 U.S. 219 (1968). Under *Harrison*, if Middleton was impelled to take the stand by the state's use of unlawfully obtained confessions, then his testimony is as tainted as those confessions. We decide that a reasonable possibility exists that Middleton was so impelled but we leave to the trial court the decision whether he was so impelled.

If on remand the trial court finds that Middleton's confessions used at the trial were made before the attorney arrived, Middleton's convictions should be reinstated. If, however, any of Middleton's confessions used at trial were made after the attorney arrived, the trial court must find whether Middleton was impelled by the use of that evidence to testify. If he was so impelled, Middleton is entitled to a new trial. If he was not so impelled, use of the unlawfully obtained confessions was harmless error and the convictions should be reinstated.

## II.

## MOTION TO SUPPRESS

### A. *Trial Court's Findings and Ruling*

Following the hearing on Middleton's motion to suppress, the trial court found the following facts, none of which are disputed:

Hilda Miller, age 72, was murdered late June 4 or early June 5, 1984. She was bludgeoned to death with a hammer, robbed, and her apartment set on fire. Middleton became a suspect June 5. Between 10:00 and 10:30 a.m. Lt. Toler of the Rock County Sheriff's Department met Middleton and gave him *Miranda* warnings, including his right to consult with counsel before and during questioning. A detective then took Middleton to the sheriff's department.

About 1:16 p.m. Middleton asked a deputy sheriff to place a telephone call from him to his home. The deputy did so, knowing that Middleton was calling his wife. The deputy heard Middleton tell his wife that he

was in the Rock County Jail and heard Middleton ask his wife to contact Gregory Hunsader.[1] The deputy knew that Hunsader is a local attorney.

After the telephone call the deputy took Middleton to the detective bureau. The deputy did not tell the detectives that Middleton had asked his wife to contact Attorney Hunsader.

About 1:30 p.m. three detectives began questioning Middleton. Lieutenant Toler first asked Middleton if he remembered and understood his *Miranda* rights. Middleton replied that he did. At no time did Middleton tell the detectives that he wanted to see an attorney or Hunsader.[2] Between 1:20 and 2:30 p.m. Middleton orally admitted that he murdered Hilda Miller.

Meanwhile, Middleton's wife called Attorney Hunsader at 1:20 p.m. and left word that he was to see Middleton at the jail. Hunsader received the message about 2:10 p.m. He arrived at the jail at 2:20 p.m. and asked to see Middleton. A deputy told Hunsader to wait because no interview room was available. About 2:30 p.m. one of the three detectives was told that Hunsader wanted to interview Middleton. The detective relayed

---

[1] The trial court found that the deputy "heard Middleton tell his wife that he was in the Rock County Jail and further heard him request that his wife contact Attorney Gregory Hunsader. [Deputy] Barfknecht was aware that Gregory Hunsader is an attorney." The context shows that the trial court did not intend to find that the deputy heard Middleton describe Hunsader as an attorney during the telephone conversation. The deputy, Middleton and Middleton's wife testified at the suppression hearing. None of these persons claimed that Middleton referred to Hunsader as an attorney during the conversation. As will be developed, the point is significant.

[2] This finding is undisputed, although Middleton claimed that he told the detectives he wanted to call Hunsader. The trial court disbelieved Middleton.

the message to Lt. Toler, who replied that Middleton had not requested a lawyer or asked for Hunsader's advice or services. At 2:43 p.m. the detective told Hunsader that Middleton had not requested an attorney. The detective refused to tell Middleton that his wife had arranged for him to meet Hunsader. The same detective told Hunsader that he could meet with Middleton, if the district attorney agreed. About 2:50 p.m. the detective told Hunsader that an attorney in the district attorney's office had said that Hunsader was not to interview Middleton.

Between 2:44 and 3:56 p.m. Middleton gave a written statement to the detectives. Before signing the statement, Middleton again received *Miranda* warnings and waived his rights in writing. He gave two additional statements that afternoon. Before each, the officers advised Middleton of his rights and he waived them in writing.

During his questioning, Middleton was alert and responsive. He was neither threatened nor promised leniency. He claimed that he told the interrogating officers he was exhausted and wanted rest, but the trial court believed the officer's contrary testimony.

The trial court held that the deputy who overheard Middleton's telephone conversation had no duty to notify the interrogating officers that Middleton told his wife to contact counsel. The court said that the deputy may well have concluded that Middleton would not answer questions until he had discussed the matter with Hunsader.

The trial court found that before the questioning and earlier that day Middleton had been advised of his *Miranda* rights and understood them. It found that before each written statement Middleton was again

advised of his *Miranda* rights and that he signed a waiver of them. The court concluded that Middleton's oral admission and his written statements were the voluntary product of a free and unconstrained will, reflected a deliberate choice and were not coerced or the product of improper police pressure. The court therefore denied Middleton's motions to suppress the statements.

## B. *Invocation of Right to Counsel*

Middleton argues that he invoked his right to counsel when the deputy overheard Middleton ask his wife to contact Hunsader. Because he invoked his right to counsel, Middleton asserts that only he could initiate questioning. Since the detectives initiated the questioning, Middleton argues that his oral and written statements must be suppressed.

Middleton correctly asserts that once an accused invokes the right to counsel, interrogation must stop until counsel is present, unless the accused initiates further conversation. An accused person in custody has an absolute right to have counsel present during questioning. *Miranda v. Arizona,* 384 U.S. 436, 474 (1966).[3] *Edwards v. Arizona,* 451 U.S. 477, 484–85

---

[3] This right to counsel arises out of the protection against self-incrimination under the fifth and fourteenth amendments. The Supreme Court requires access to counsel under *Miranda* and *Escobedo v. Illinois,* 378 U.S. 478 (1964), in order to protect the fifth amendment privilege against self-incrimination rather than to vindicate the sixth amendment right to counsel. *United States v. Gouveia,* 467 U.S. 188, 81 L. Ed. 2d 146, 154 n.5 (1984). The sixth amendment right to counsel applies to all critical stages of the prosecution at or after the time the authorities initiate adversary proceedings against the accused "by way of formal charge, preliminary hearing, indict-

(1981), adopted the rigid rule that if an accused expresses a desire to deal with the police only through counsel, he is not subject to further interrogation until counsel is made available, unless he validly waives the earlier request for counsel. *Smith v. Illinois*, 469 U.S. 91, 94–95 (1984).

A valid waiver of an invoked right to counsel is not established merely by showing that the accused responded to police-initiated interrogation after the accused was again advised of his rights. *Edwards*, 451 U.S. at 484–85. *"Edwards* established a bright-line *per se* rule that, 'once a suspect has invoked the right to counsel, any subsequent conversation must be initiated by him.' " *State v. Lampe*, 119 Wis. 2d 206, 213, 349 N.W.2d 677, 681 (1984) (quoting *Solem v. Stumes*, 465 U.S. 638 [1984]).[4] Since the detectives initiated the questioning during which Middleton confessed, if he invoked his right to counsel during his telephone call,

---

ment, information, or arraignment." *Kirby v. Illinois*, 406 U.S. 682, 689 (1972). None of those events had occurred when Middleton gave his statements.

[4] The state erroneously relies on pre-*Edwards* cases holding that an accused could knowingly and intelligently waive an invoked right to counsel without initiating further communication, exchanges or conversations with the police. *Jordan v. State*, 93 Wis. 2d 449, 287 N.W.2d 509 (1980); *Schilling v. State*, 86 Wis. 2d 69, 271 N.W.2d 631 (1978). Under *Edwards*, "if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, *and* (b) knowingly and intelligently waived the right he had invoked." *Smith v. Illinois*, 469 U.S.—, 83 L. Ed. 2d at 494 (emphasis added). *Schilling* and *Jordan* state only the second half of the *Edwards* rule. If the first half, restriction by the accused for further discussion, is not met, the accused's statements are inadmissible.

suppression of his statements is the automatic result under *Edwards'* bright-line rule. *Lampe,* 119 Wis. 2d at 213, 349 N.W.2d at 681.

■

Because the historical facts surrounding his telephone conversation are undisputed, whether he invoked his right to counsel is a question of constitutional fact. We decide constitutional fact issues independently of the trial court's decision. *State v. Hartwig,* 123 Wis. 2d 278, 283, 366 N.W.2d 866, 869 (1985).

The *Miranda* Court said, that if the individual is alone and indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking, the police may not question him. 384 U.S. at 444–45. The *Edwards* Court referred to a suspect's "express[ing] his desire to deal with the police only through counsel" or "clearly assert[ing] his right to counsel." 451 U.S. at 484–85. No decision of the United States Supreme Court has reduced these general principles to more specific terms for purposes of determining whether a suspect has adequately expressed the desire for counsel.

This state's appellate courts have not required an explicit, unequivocal or unmistakable expression of the desire for counsel. *See Lampe,* 119 Wis. 2d at 217, 349 N.W.2d at 683 (right invoked by asking prosecutor, "Do you think I ought to have an attorney?"); *Micale v. State,* 76 Wis. 2d 370, 373, 251 N.W.2d 458, 460 (1977) (right invoked by telling officer accused could not afford an attorney); *State v. Collins,* 122 Wis. 2d 320, 328 n.5, 363 N.W.2d 229, 233 (Ct. App. 1984) (right invoked by asking to call attorney or agreeing with suggestion that attorney be called); *State v. Wegner,* 118 Wis. 2d 419, 425, 348 N.W.2d 603, 606 (Ct. App. 1984) (right invoked

by accused's stating he could not afford counsel); *compare State v. Estrada*, 63 Wis. 2d 476, 488–89, 217 N.W.2d 359, 366, *cert. denied*, 419 U.S. 1093 (1974) (accused's statement that his wife would contact an attorney "as soon as he had this thing straightened out" not a request for counsel).

Because, however, invoking the right to counsel is an expression of the accused's desire to deal with the police only through counsel, *Edwards*, 451 U.S. at 484, that desire must be communicated to the police. Thus, in a pre-*Miranda* decision, *Neuenfeldt v. State*, 29 Wis. 2d 20, 24, 138 N.W.2d 252, 255 (1965), *cert. denied*, 384 U.S. 1025 (1966), our state supreme court said that the request for an attorney "need not be a formal one, but . . . [it] must be communicated in some manner to him who has custody of the accused before it can be said there was a denial of counsel."

Although the suspect will usually communicate the desire for counsel directly to the police, we see no reason why indirect communication, such as to a police bystander, should be ineffective so long as the suspect has reason to believe the communication is effective. That is, the suspect must have some basis for believing that the bystander, as well as the person directly addressed, will understand that the suspect wants counsel. A suspect cannot expect the police to honor his or her desire for counsel unless the suspect has a reasonable basis for believing that the police realize that he or she has the desire.

The record fails to show that such a reasonable basis existed. Middleton must have known that the dep-

uty heard what Middleton said to his wife. But Middleton referred to Hunsader only by name. Neither Middleton nor his wife testified that he referred to Hunsader as an attorney. Nor did the deputy. No circumstance exists from which we can infer that Middleton believed that the deputy knew Hunsader was an attorney.[5] Middleton did not claim he had that belief or show that other facts existed which entitled him to believe that the deputy knew Hunsader was an attorney.

The only reasonable inference from the facts of record is that Middleton intended his wife to know he wanted counsel but had no way of knowing whether the deputy understood this was the case. If, as here, only one reasonable inference from the undisputed facts is possible, an appellate court may draw it. *Vocation. Tech. & Adult Ed. Dist. 13 v. ILHR Dept.*, 76 Wis. 2d 230, 240, 251 N.W.2d 41, 46 (1977).

Because Middleton has shown no reasonable basis for him to believe that the police would understand that he wanted an attorney, we hold that Middleton did not invoke his right to counsel.

---

[5] *Compare* another bystander case, *State v. Elmore*, 500 A.2d 1089 (N.J. Super. Ct. App. Div. 1985), with the facts before us. In *Elmore* an officer overheard the suspect tell her mother by telephone that she was not permitted to have an attorney. He interrupted the suspect and told her no one had denied her request since she had never asked for an attorney. The New Jersey court held that the suspect had invoked her right to counsel. The suspect in *Elmore* had the reasonable basis which is absent from the record before us.

## C. *Police Duty to Inquire about Counsel*

■

Middleton argues that before questioning him the detectives should have asked if he had an attorney. The detectives had no such duty. Middleton was given *Miranda* warnings, which included a statement of his right to counsel. *Miranda* warnings are just that. They are informational statements, not questions.

## D. *Suspect's Right to be Told Attorney Present and Available*

While this appeal was pending, the United States Supreme Court held in *Moran v. Burbine,* —U.S. —, 89 L. Ed. 2d 410 (1986), that failure of the police to tell a suspect that an attorney was present and available did not vitiate the suspect's knowing waiver of his fifth amendment right against self-incrimination or affect his sixth amendment right to counsel.

In *Burbine* the suspect had been arrested for murder and taken to a police station for interrogation. His sister contacted the public defender's office to secure him legal counsel. A public defender attorney called the police and said she would act as the suspect's counsel if they intended to interrogate him. The police later interrogated the suspect without telling him that the public defender had called. Unaware of his sister's efforts and that an attorney had telephoned, the suspect waived his *Miranda* rights.

The *Burbine* court held that the waiver was valid. It said that an attorney's unilateral effort to contact a detained suspect does not affect the suspect's rights under the fifth and sixth amendments. The Court said

that events unknown to the suspect had no bearing on his capacity to comprehend and knowingly relinquish his constitutional right.

The question is whether the *Burbine* holding compels the conclusion that Middleton waived his *Miranda* rights. We conclude it does not.[6]

Unlike the suspect in *Burbine,* while Middleton was in custody but before he was interrogated, Middleton telephoned his wife and asked her to contact Hunsader. Unlike the suspect in *Burbine,* Middleton knew and in fact initiated the events which led to a specific attorney's coming to the jail. Unlike the attorney in *Burbine,* Hunsader did not unilaterally seek to contact Middleton. Unlike the facts in *Burbine,* a police officer guarding Middleton overheard the call for the attorney. The officer's knowledge of that call is imputed as a matter of law to the entire police force, whether or not he failed to pass it on.[7] Consequently, the interrogating officers

---

[6] *See People v. Houston,* Calif. Sup. Ct., Oct. 2, 1986, 40 Co. L. 2045. The *People* Court rejects the rationale of *Moran v. Burbine,* — U.S. —, 89 L. Ed.2d 410 (1986), and held that under the California constitution, "a suspect who has waived his rights under *Miranda v. Arizona,* 384 U.S. 346 (1966), must be allowed to reconsider if a lawyer shows up at the place of interrogation and offers assistance...."

[7] One officer's knowledge of a fact is generally imputed to the entire police force. In some instances imputation benefits police. *See, generally, U.S. v. Clark,* 559 F.2d 420 (1977) (in determining existence of probable cause for a search, court looks to the collective knowledge of police officers rather than the sole knowledge of the officer who performed the actual search). *See also State v. Drogsvold,* 104 Wis. 2d 247, 311 N.W.2d 243 (Ct. App. 1981), and *Johnson v. State,* 75 Wis. 2d 344, 249 N.W.2d 593 (1977) (arresting officer need not have requisite knowledge for probable cause if the collective knowledge of the police is adequate to sustain the arrest). Imputa-

denied the attorney access to Middleton when they knew or should have known that Middleton had asked his wife to contact the attorney.

A valid waiver of *Miranda* rights must be made knowingly and voluntarily. *Miranda v. Arizona*, 384 U.S. 436, 475 (1966); *White v. Finkbeiner*, 570 F.2d 194, 201 (1978). The *Burbine* rationale is that events unknown to the suspect cannot affect the validity of his waiver. The *Burbine* court therefore refused "to adopt a rule requiring that the police inform a suspect of *an* attorney's efforts to reach him." (Emphasis added.) — U.S. at —, 89 L. Ed. 2d at 423.

But here the police failed to tell the suspect, Middleton, that the specific attorney he had directed his wife to contact had arrived. Had Middleton been told that the attorney had arrived but he nevertheless continued to give statements to the police, the waiver of his *Miranda* rights would have been knowing.

The knowing quality of Middleton's waiver disappeared when the facts of his interrogation were changed without his knowledge. When the police failed to tell Middleton that Hunsader had arrived, they induced

tion may benefit a suspect. *See State v. Arceneaux*, 425 So. 2d 740 (La. 1983), and *People v. Bundy*, 398 N.E.2d 345 (Ill. App. Ct. 1979) (when defendant refused to talk in absence of counsel, subsequent interrogating officer charged with knowledge of that fact). If the right to silence or right to counsel is involved, that police acted in good faith is irrelevant. *White v. Finkbeiner*, 687 F.2d 885 (7th Cir. 1982) ("good faith exception to *Edwards* rule . . . might permit relatively easy circumvention of that rule"). *See also, State v. Taylor*, 468 So. 2d 617 (La. Ct. App. 1985) (if officers have actual knowledge of invalidity of an arrest warrant, all successive officers who deal with the defendant held to have knowledge of invalidity).

313

Middleton to believe that a state of facts continued to exist when that was no longer true. Because the police knew Middleton had directed his wife to contact Hunsader, the police knew Middleton's continued participation in the interrogation was based on his mistaken understanding. They knew his *Miranda* waiver was no longer knowing from the time Hunsader arrived. From and after that time, Middleton's waiver of his *Miranda* rights was invalid.

That Middleton gave his written confessions after Hunsader arrived is undisputed. His written confessions should have been suppressed. If Middleton orally confessed after Hunsader arrived, then his oral confession should have been suppressed.

### E. *State Constitutional Claims Mooted*

Having determined Middleton's rights under the fifth and fourteenth amendments to the United States Constitution, we need not decide whether his rights under the Wisconsin State Constitution have been violated.

### III.

### HARMLESS ERROR ANALYSIS

### A. *Introduction*

Middleton's written statements and perhaps his oral statements in the interrogation room were obtained unlawfully. We cannot be certain whether all or part of

314

his admissions to the effect that he killed Miller, took money from her and started the fire, arose out of his written statements or out of his oral statements or both. Nor can we resolve those issues, since they depend upon a fact not of record: what parts of Middleton's statements the state used at trial were obtained after Attorney Hunsader arrived at the police station. It may be, however, that because Middleton testified, the error, if any, was waived or was harmless.

If Middleton freely testified, he may have waived any claim of prejudice arising from his unlawfully obtained inculpatory statements. Whether he freely took the stand turns on the analysis outlined in *Harrison v. U.S.*, 392 U.S. 219 (1968). If his testimony was impelled by the state's use of tainted evidence, then his testimony was improperly before the jury. We do not decide whether Middleton's testimony was so impelled but only whether a reasonable possibility exists that such is the fact. If we conclude such possibility exists, the trial court must find on remand whether the testimony was in fact impelled. And our *Harrison* analysis need only assume without deciding that the statements used by the state at trial were obtained after Hunsader arrived and are therefore inadmissible.

■

If we conclude from our *Harrison* analysis that a reasonable possibility exists that Middleton's testimony was improperly before the jury, then the question is whether harmless error occurred. When a federal constitutional right has been denied, the test for harmless error is whether a reasonable possibility exists that the error contributed to the conviction. *Chapman v. California*, 386 U.S. 18, 23 (1967); *State v. Dyess*, 124 Wis. 2d 525, 543, 370 N.W.2d 222, 231–32 (1985).

315

To determine whether the error (assuming it to be such) was harmless, we examine the state's case independently of tainted evidence. We then assess the impact of the tainted evidence on the jurors in light of the other evidence they heard during the state's case. Unless the properly admitted evidence of guilt in the state's case is so overwhelming as to render the improper use of Middleton's admission harmless, *Harrington v. California*, 395 U.S. 250 (1969), there must be a new trial.

## B. *Waiver—Harrison Analysis*

In his opening statement, the prosecutor told the jury that the state would introduce an admission by Middleton that he used a hammer to kill Hilda Miller. During the state's case in chief, Detective Dilly testified that when interrogated at the bureau, Middleton admitted he killed Miller by hitting her in the back of the head with a hammer, took her purse, and started a fire. The officer did not clarify which of those admissions were made orally or in writing or both.

When Middleton took the stand, he admitted he killed Hilda Miller but claimed he lacked the requisite intent for first-degree murder. "A defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives, and that waiver is no less effective or complete because the defendant may have been motivated to take the witness stand in the first place only by reason of the strength of the *lawful* evidence adduced against him." *Harrison v. United States*, 392 U.S. at 222 (emphasis added). But if Middleton took the stand to overcome the

impact of his illegally obtained and used confessions, then his testimony was tainted by the same illegality that rendered the confessions themselves inadmissible. *Harrison*, 392 U.S. at 223.

The question is therefore why Middleton testified. If his testimony was, in fact, impelled by the prosecution's use at the trial of his illegally obtained confessions, then his testimony is as tainted as his confessions. *Harrison*, 392 U.S. at 223. The state "must show that its illegal action did not induce his testimony." *Harrison*, 392 U.S. at 225. In *Harrison*, the defendant took the stand after his confessions were admitted in evidence, and since the prosecution did not show that his testimony was "purged of the primary taint," the supreme court reversed the conviction. *Id.* at 226. We reemphasize that this court will not decide whether Middleton's testimony was, in fact, so impelled. We decide only whether a reasonable possibility exists that such is the fact, since the trial court must make that finding.

The state asserts that the circumstantial evidence linking Middleton to the crimes was strong. It contends that to avoid a conviction on first-degree murder, he had to testify to establish his intoxication in an effort to negate the intent requirement for first-degree murder. The state urges that we find Middleton was not induced to testify by the state's use of his illegally obtained confessions.

The state relies partly on the opening statement by counsel for Middleton made immediately after the prosecution's opening statement. Middleton's attorney told the jury that "the evidence in this case, including the evidence that he was drunk, will show that Doug Middleton is guilty of murder, armed robbery, and arson,

but not first-degree murder because it will show he did not intend to kill Hilda Miller." She said he "was drunk, [and] acted impulsively without thinking and without intent."

These concessions by Middleton's counsel fail to meet the state's burden to show that its illegal action in obtaining Middleton's confession did not induce his testimony at the trial. Counsel's concessions were made in response to the state's opening statement. They may have been induced by the state's earliest possible use at the trial of Middleton's confessions. Moreover, if Middleton's trial testimony was induced by the prosecution's use of his illegally obtained confessions, then the same must be true of his attorney's concessions made when outlining to the jury the evidence it would hear from the defense.

The state therefore also relies upon the circumstantial evidence itself to satisfy its burden under *Harrison, supra.* We of course limit our review to the evidence the state produced, excluding its use of admissions Middleton made when in the interrogation room.

The state presented evidence that Hilda Miller was a cautious person who kept the door to her Edgerton apartment locked and never let strangers in. She knew Middleton. He did small jobs for her. They sometimes socialized. There was no indication that the apartment was broken into on the night of the murder.

Hilda Miller was murdered during the night of June 4/5, 1984. She had received her social security check for $351 three days before. She had paid her $145 rent and made a few minor expenditures. She customarily kept her folding money in a small box and she kept jars of change in her dresser. The jars were gone after her mur-

der. The record is silent as to whether any folding money was found in her apartment.

Middleton visited Hilda about 5:00 p.m. on June 4. He went because he needed $200 to post bond on a shoplifting charge. He had called his wife from the courthouse that afternoon and asked her to get the money from Hilda. Before he was a suspect, Middleton told the police that he went to Hilda's to borrow $20 for beer. Later that night Middleton had over $100 in folding money and $19.90 in change. When he cashed in the change at a bar, he threw a handful of pennies on the floor saying he didn't want them.

Middleton was seen leaving Hilda's apartment about 7:00 p.m. on the night of the murder. He was walking quickly and carrying a small TV and some boxes or suitcases to his wife's car parked outside Hilda's apartment. The same car was also seen outside her apartment about 10:30 p.m. and 11:45 p.m. That night Middleton tried to sell a TV matching the description of that owned by Hilda.

A little after 1:00 a.m. on June 5 firemen responded to a call that Hilda Miller's apartment was on fire. They found her in the apartment lying face down in a pool of blood. She was taken to Edgerton Memorial Hospital where she was pronounced dead. A doctor testified that death resulted from six or seven blows to the head with a curved object like a claw hammer. The claw hammer Miller kept in her kitchen was missing after her death. A fireman testified that when he arrived the drawers had been pulled out of Miller's dresser and her clothes were scattered. Fire experts determined that the fire had been caused by arson, using gasoline.

At 3:35 a.m. the phone rang at Miller's apartment. Telephone company records show that the call was

made from Middleton's home in Stoughton. A police lieutenant was in the apartment and took the call. He recognized Middleton's voice from a previous contact. Middleton asked, "Where is Hilda? What is going on over there?" Middleton added that he had been "by around 1:00 a.m." and everything had been fine. The lieutenant told Middleton that Hilda was at the hospital and was fine. Middleton agreed to meet the officers at the hospital.

At 4:38 a.m. Middleton spoke to officers at the hospital. He told Officer Struebin that Hilda was like a second mother to him. About the same time Detective Dilly asked Middleton how much money he was carrying. Middleton said he had $15 and displayed the money, but when he was booked he had $495 which he said his wife had given him.

At 5:45 a.m. the police, with Middleton's permission, searched Middleton's car. At that time Officer Burdick saw what appeared to be several drops of blood on Middleton's tennis shoes. Between 7:00 and 7:30 a.m. the police obtained warrants to search Middleton and his apartment. When seized, the tennis shoes had holes where the apparent blood stains had been.

A crime lab expert testified that she found traces of a stain around the edges of the holes in Middleton's tennis shoes, but she could not positively identify the stains as blood. Experts found nothing on Middleton's clothes nor fingerprints at the scene to connect him with the crime.

The question, as we have stated, is not whether Middleton made a knowing decision to testify but why he testified. *Harrison*, 392 U.S. at 223. Why he testified is a fact which must be inferred from other evidence. 392 U.S. at 226.

The court of appeals is limited to appellate jurisdiction and cannot make a factual determination if the evidence is in dispute. *Wurtz v. Fleischman,* 97 Wis. 2d 100, 107 n.3, 293 N.W.2d 155, 159 (1980). We may, however, decide which inferences may be reasonably drawn from the undisputed evidence. *Pfeifer v. World Service Life Ins. Co.,* 121 Wis. 2d 567, 571, 360 N.W.2d 65, 67 (Ct. App. 1984). Deciding the reasonableness of an inference is a "recognized appellate function." *Id.* Deciding on the basis of such inferences that there is a reasonable possibility that a fact exists is also an appropriate appellate function.

In spite of the strength of the circumstantial evidence we have just reviewed, and even though he faced possible conviction for first-degree murder, a reasonable possibility exists that Middleton would not have testified had the state refrained from using his confessions at the trial. He could have relied on the presumption of innocence and the lack of evidence directly linking him to the murder. But once the state showed the jury that he had admitted to killing Hilda Miller, taking money from her and starting the fire, a reasonable possibility exists that Middleton had no choice. He had to testify in hopes of establishing that, because of intoxication, he lacked intent to kill.

We conclude that it is reasonably possible that Middleton would not have testified but for the confessions which the state put in evidence. That another reasonable possibility exists does not meet the state's burden. Whether Middleton in fact testified because the state used his confessions will be for the trial court to decide. We cannot say, at this point, that the state has demon-

strated that Middleton would have testified had the jury not heard that he admitted to killing Hilda Miller.

Consequently, we cannot conclude at this point that Middleton waived his privilege against self-incrimination by taking the stand. The factual basis for such a finding will be for the trial court.

## C. *Harmless Error Analysis*

If the jury should not have heard Middleton's admissions, the question remains whether the error, if any, in the state's use of his admissions affected the verdict. The error may be harmless if the properly admitted evidence of guilt is overwhelming. *Harrington v. California*, 395 U.S. 250 (1969). The test is whether a reasonable possibility exists that the error contributed to the conviction. *State v. Dyess*, 124 Wis. 2d 525, 543, 370 N.W.2d 222, 231-32 (1985).

We have already outlined the state's case exclusive of Middleton's statements. Strong circumstantial evidence suggests that Middleton murdered Hilda Miller. The state's case, however, contains critical gaps. The state failed to produce evidence directly linking Middleton to the murder, the theft or the arson. Middleton's admissions filled the gaps which the jury would have had to fill by inference.

Without Middleton's admissions, the jury could have returned a verdict of not guilty. That possibility evaporated when the jurors heard his admissions. A reasonable possibility therefore exists that the error, if it was error, in the state's use of his admissions, contributed to Middleton's conviction and was not harmless. *State v. Dyess, supra.*

## IV.

## CONCLUSION

We conclude that we must reverse the convictions and remand. On remand the trial court shall make findings of fact regarding which of Middleton's oral statements were given in the interrogation room after Attorney Hunsader arrived. If Middleton's inculpatory statements the state used at trial were given by Middleton before Hunsader arrived, his convictions should be reinstated.

If any such statements were made after Hunsader arrived, then the trial court should make an analysis under *Harrison, supra*, to find whether Middleton's testimony was impelled by those admissions. The trial court may hold an evidentiary hearing for that purpose.

If Middleton's testimony was impelled by the state's use of unlawfully obtained admissions, then a new trial is necessary. If Middleton's testimony was not so impelled, then he waived his rights against self-incrimination, and the convictions should be reinstated.

*By the Court.*—Judgment of conviction reversed and cause remanded for further proceedings consistent with this opinion.