STATE of Wisconsin, Plaintiff-Respondent,

v.

Gerald B. KRAMAR, Defendant-Appellant-Petitioner.

Supreme Court

*No. 87–2111–CR. Argued March 29, 1989.—Decided May 23, 1989.*

(Also reported in 440 N.W.2d 317.)

For the defendant-appellant-petitioner there was a brief and oral argument by *Michael Yovovich,* assistant state public defender.

For the plaintiff-respondent the cause was argued by *David J. Becker,* assistant attorney general, with whom on the brief was *Donald J. Hanaway,* attorney general.

LOUIS J. CECI, J.   This case is before the court on a petition for review of an unpublished decision of the court of appeals dated September 1, 1988, which affirmed a judgment of the circuit court for Rock county, Edwin C. Dahlberg, Circuit Judge, convicting the defendant of first-degree murder under sec. 940.01, Stats. 1985–86.[1] Three issues are presented for review.

[1]Section 940.01, Stats. 1985–86, provided as follows:

**940.01 First-degree murder. (1)**   Whoever causes the death of another human being with intent to kill that person or another is guilty of a Class A felony.

The first issue is whether a seizure of the defendant occurred, for fourth amendment purposes,[2] when the defendant went with the police officers to the police station for questioning. The second issue is whether the police violated the defendant's *Miranda* rights. The third issue is whether the circuit court erred by refusing to instruct the jury on the lesser-included offense of second-degree murder. We conclude that no seizure of the defendant occurred for fourth amendment purposes when the defendant went with the police officers to the police station for questioning. In addition, we find that the police did not violate the defendant's *Miranda* rights. Finally, we hold that the circuit court did not err by refusing to instruct the jury on the lesser-included offense of second-degree murder.

The facts of this case are as follows. On October 23, 1984, at approximately 1:15 p.m., Scott Alf was fatally shot, twice in the back and once in the head at close range with a .22–caliber rifle. The police learned that the defendant and an individual by the name of Troy Oltrogge may have been with the victim earlier in the day. Therefore, at approximately 5:00 p.m., three police officers, Detective Markley, Captain Pittner, and Captain Tilley, went to the defendant's home to question the defendant, then sixteen years old, as to his knowl-

---

(2) In this chapter 'intent to kill' means the mental purpose to take the life of another human being.

[2]The fourth amendment to the United States Constitution provides as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

edge of the shooting. The defendant's parents were home and allowed the officers into the house. After approximately twenty to thirty minutes of discussion among the officers and the defendant's parents, the defendant's parents gave the officers permission to take the defendant to the police station for questioning about an "important matter." Most of the discussion among the officers and the defendant's parents took place outside the presence of the defendant, who, after observing five to ten minutes of the discussion, left the area of the house in which the officers were standing. The officers told the defendant's parents that the defendant would be returned shortly if everything worked out. The defendant's mother then attempted to call the defendant's attorney, Edwin Nash, and, when she could not reach him, she gave the officers the attorney's name and telephone number. The officers told her that they would contact the attorney.

The defendant's mother then called the defendant from his room in the basement and told him to go with the officers. On the way up the stairs from the basement, the defendant asked his mother to contact his attorney. No one asked the defendant whether he wanted to go to the police station. Before getting into the police car, one of the officers patted down the defendant. The defendant was not handcuffed. At 5:21 p.m., Detective Markley drove the defendant to the Beloit police station.

Upon arriving at the police station, Detective Markley advised the defendant of his constitutional rights as prescribed by *Miranda v. Arizona,* 384 U.S. 436 (1966). The detective read the defendant his rights from the standard Beloit police department waiver form. After reading the rights, Detective Markley asked the defendant if he understood them. The defendant

responded, "Yes." Detective Markley then asked the defendant whether or not he wished to speak to him (Detective Markley). The defendant again responded, "Yes."

Detective Markley then had the defendant sign the waiver form. The defendant signed the form at 5:43 p.m. The waiver form that the defendant signed contained, in addition to the *Miranda* rights that had been read to the defendant, the following language:

> I understand each of these Constitutional rights. I did [sic] not want a lawyer at this time. I wish to make the following statement voluntarily, knowing it can and will be used against me in a court of law. No promises or threats have been made to me and no pressure or coercion of any kind has been used to get me to make this statement.

After the defendant signed the form, Detective Markley performed a test on the defendant's hands for evidence of gunpowder residue. At the conclusion of the test, Markley spoke with the defendant for approximately five minutes. Markley described that conversation as follows:

A  [Detective Markley] Basically I told Gerald that I felt that he knew something about this incident. Not—obviously I had apparently told him what the incident was.

. . .

Q  So you said, 'I know you know something about the homicide of Scott Alf'?

A  In so many words.

Q  Okay.

A  And his reply basically was, 'No, I don't.'

Q  What else did you say?

A  I believe about the only thing that was said that was the gist of the conversation. It may have been repeated both question and answer and then like I say, within five minutes I left.

While Detective Markley was with the defendant, Captain Pittner contacted the defendant's attorney. Captain Pittner told the defendant's attorney that he was calling in respect to the wishes of the defendant's parents, that the defendant was at the police station, and that the police were preparing to interview the defendant in regard to a homicide that had happened that afternoon.

After talking with the defendant's attorney, Captain Pittner asked Officer Edge to take a statement from the defendant. Consequently, at approximately 6:30 p.m., Officer Edge entered the room where Detective Markley was performing the gunpowder residue test on the defendant. Officer Edge ascertained from Detective Markley that the defendant had been given his *Miranda* warnings. Less than ten minutes after Officer Edge entered the room, Detective Markley left.

After Detective Markley left, Officer Edge began a conversation with the defendant. At the time, Officer Edge had the understanding that the defendant was a witness to a shooting. He believed that the main suspect in the shooting was Troy Oltrogge. Within the first ten minutes of the conversation, the defendant stated that he did not want to give Officer Edge a statement until he talked to his attorney. Officer Edge did not continue questioning the defendant about the incident after the defendant requested his attorney. Rather, Officer Edge attempted to contact the defendant's attorney. At 6:51 p.m., after ascertaining who the

defendant's attorney was and determining where to contact him, Officer Edge attempted to call the defendant's attorney, but there was no answer.

After attempting to reach the defendant's attorney, Officer Edge went into the hall to get a soda for the defendant. There, Officer Edge encountered Detective Markley, who led Officer Edge to believe that the defendant was the one who had shot Scott Alf. Because of that development, Officer Edge decided to contact the defendant's father and mother. He advised them to come down to the police station to be with their son because he felt it would be better if they were more involved in the situation. The defendant's parents stated that they did not care to come to the police station because they believed the police would be bringing the defendant back when the officers were done talking to him, and the parents were both in poor health.

At 7:10 p.m., either as a result of Officer Edge calling the defendant's attorney again or as a result of the defendant's attorney calling Officer Edge, the two made telephone contact. The defendant's attorney talked not only to Officer Edge, but also to the defendant. After the defendant talked to his attorney, he told Officer Edge that he had been advised not to talk to him.

Officer Edge did not discuss the case further with the defendant. Instead, Officer Edge summoned a juvenile intake worker, Steve Fernan, to arrange for the defendant's processing. Mr. Fernan arrived at the police station at 7:43 p.m., followed by the defendant's attorney at 7:48 p.m. Officer Edge described what occurred between 7:10 p.m. when he and the defendant talked to the defendant's attorney by phone and 7:48 p.m. when the defendant's attorney arrived at the police station:

A [Officer Edge] Between the point of 7:10—

Q The phone call with [the defendant's attorney]—

A —and 7:48 after he talked to—after [the defendant's attorney] talked to [the defendant], nothing was said in between that time, nothing was said about the shooting, no.

Q Did you remain in [the defendant's] presence in that room between those two periods of time?

A Yes.

Q What did you do? Just stare at him for that period of time?

A Well, you notice that form you had here on the referral. I was probably filling that out. I was doing paperwork, probably that and making the phone calls. We were having small talk. The atmosphere was very comfortable. Nothing—we weren't talking about anything to do with the shooting because he stated he didn't care to talk about it and he was not going to. So talked about whatever would come up. If he wanted to talk about schoolwork, he wanted to talk about his parents, he talked.

Sometime between 7:10 and 7:48 p.m., Officer Edge had a conversation with Officer Thomas Fearn just outside the door of the office in which he was talking to the defendant. Officer Fearn told Officer Edge that they had evidence at that time which indicated that the defendant was probably the person who shot Alf and that the defendant would be so charged. The evidence Officer Fearn was apparently referring to was a written statement completed by Troy Oltrogge at 7:05 p.m., which implicated the defendant in the shooting of Alf. At 7:40 p.m., Officer Edge went back into the office and

told the defendant that he would be charged with the killing of Alf. The defendant's reaction, according to Officer Edge, was that he "just got quiet."

After the defendant's attorney arrived at 7:48 p.m., he talked to the defendant. The defendant told Officer Edge he had again been advised by his attorney not to say anything. But "shortly after" the defendant's attorney left, while Officer Edge was sitting and waiting for someone to take the defendant and process him, the defendant took the soda can that he was holding in his hand, slammed it down on the arm of the chair in which he was sitting, and said, "To hell with it. I will tell you what happened." Officer Edge had not been questioning the defendant at that time. The defendant's statement came "all of a sudden." It was "spontaneous" and took Officer Edge "quite by surprise ... because it had been real quiet in there."

After stating that he would tell Officer Edge what happened, the defendant continued talking, without any further questioning by Officer Edge, and admitted that he had shot Alf. After the defendant made his statement, Officer Edge left the office and went out into the hallway area. The defendant's attorney and the defendant's parents, who had come down to the station at the suggestion of the defendant's attorney, were in the hallway area. Officer Edge went over to the defendant's father, advised him of the situation, and told him that the police had been unable to locate the murder weapon. The father responded, "Well, I realize that my son's in a lot of trouble and he will probably get the worst end of this, but let me go in and find out where that rifle is." The father then went into the office by himself. Officer Edge did not direct him to go in. The defendant told his father the location of the murder

weapon. The weapon was thereafter recovered in a consent search.

At the defendant's trial, a number of defense motions were filed, challenging the legality of defendant's arrest, the taking of statements from the defendant, and the seizure of evidence based on the allegedly improper conduct of the police. The circuit court ruled on the suppression motion and held: first, that the defendant was not illegally seized and that the defendant's statement to Officer Edge could not be suppressed; second, that the defendant was not being interrogated at the time he confessed and that the confession was volunteered; and third, that when the defendant's father obtained the information from the defendant regarding the location of the murder weapon, the father was not acting as an agent of the police. In addition, the circuit court denied the defendant's request for jury instructions concerning second-degree murder and reckless homicide as lesser-included offenses.

At the court of appeals level, the defendant raised three issues which are relevant to our review. The first issue raised by the defendant was whether the police illegally seized the defendant, requiring the suppression of the defendant's confession. The court of appeals concluded that the police did not illegally seize the defendant. The second issue raised was whether the police violated the defendant's *Miranda* rights. The court of appeals found that the police did not violate the defendant's *Miranda* rights. The third issue raised was whether the circuit court erred in refusing to instruct the jury on second-degree murder. The court of appeals held that the circuit court did not err in refusing to instruct the jury on second-degree murder.

## WHETHER A SEIZURE OF THE DEFENDANT OCCURRED FOR FOURTH AMENDMENT PURPOSES WHEN THE DEFENDANT WAS TAKEN TO THE POLICE STATION FOR QUESTIONING

A circuit court's findings regarding the historical facts surrounding a defendant's detention will not be overturned unless they are clearly erroneous. Section 805.17(2), Stats.; *State v. Nash,* 123 Wis. 2d 154, 161, 366 N.W.2d 146 (Ct. App. 1985); *State v. Smith,* 119 Wis. 2d 361, 366, 351 N.W.2d 752 (Ct. App. 1984). Whether these facts rise to the level of a seizure invoking fourth amendment protections is a constitutional fact which this court determines independently. *State v. Woods,* 117 Wis. 2d 701, 715–16, 345 N.W.2d 457 (1984); *Nash,* 123 Wis. 2d at 161–62; *Smith,* 119 Wis. 2d at 366.

Whether a person has been seized for fourth amendment purposes is determined by an objective test. A person is seized within the meaning of the fourth amendment only if, in view of all the circumstances, a reasonable person would have believed he was not free to leave. *Florida v. Royer,* 460 U.S. 491, 501–02 (1983) (White, J., plurality opinion joined by Marshall, J., Powell, J., and Stevens, J.); *United States v. Mendenhall,* 446 U.S. 544, 554 (1980) (Stewart, J., plurality opinion joined by Rehnquist, J.); *Nash,* 123 Wis. 2d at 162; *Smith,* 119 Wis. 2d at 366. Examples of circumstances that might indicate a seizure would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of

voice indicating that compliance with the officer's request might be compelled. *Mendenhall,* 446 U.S. at 554; *Nash,* 125 Wis. 2d at 162; *Smith,* 119 Wis. 2d at 366. Any subjective intention of the officers to detain a person is relevant only to the extent it is conveyed to that person. *State v. Reichl,* 114 Wis. 2d 511, 515, 339 N.W.2d 127 (Ct. App. 1983).

The record in this case and the circuit court's findings indicate that no physical force was used by the officers to compel the defendant to accompany them to the police station. The defendant was not handcuffed by the officers, although an officer did pat him down before transporting him to the police station. There was no evidence that the officers ever drew their weapons. In addition, there was no evidence that the officers used any language or tone of voice indicating that compliance with their request that the defendant accompany them to the police station might be compelled. Rather, the officers spent approximately twenty to thirty minutes discussing with the defendant's parents whether the defendant would be allowed to accompany the officers to the police station. The defendant was present for about five or ten minutes of that discussion and then the defendant left the officers' presence for the balance of the discussion.

We conclude that under the preceding circumstances, a reasonable person in the defendant's position would have concluded that he was free to refuse to accompany the officers to the police station. The fact that the officers engaged in an extended discussion with the defendant's parents, seeking their permission to take the defendant to the police station for questioning, would have indicated to a reasonable person in the defendant's position that he could have refused to accompany the officers to the station because if the

officers had intended to take the defendant into custody, the officers simply would have done so without engaging in a lengthy discussion with the defendant's parents. Moreover, the fact that the defendant was allowed to leave the officers' presence while the discussion among the officers and the defendant's parents was going on would have indicated to a reasonable person in the defendant's position that he was not being taken into custody by the officers because if the officers had intended to take the defendant into custody, the officers would not have allowed him to leave their presence.

The defendant maintains, however, citing *Huebner v. State,* 33 Wis. 2d 505, 516, 147 N.W.2d 646 (1967), that an individual should be told that he has no obligation to go to the police station. We conclude that while a person's awareness of his freedom to refuse to accompany the police to the police station is an important consideration in determining whether a seizure has occurred, whether a seizure has in fact occurred does not depend on whether the defendant has been told that he does not have to cooperate. *Smith,* 119 Wis. 2d at 366, citing *Mendenhall,* 446 U.S. at 555. Thus, notwithstanding the fact that the officers never expressly told the defendant that he did not have to accompany them to the police station, we conclude that under the circumstances outlined above, a reasonable person in the position of the defendant would have concluded that such was the case.

Therefore, we hold that when the defendant acquiesced in his mother's direction that he accompany the officers to the police station[3] and when the defen-

---

[3]The defendant maintains, citing *State v. Lee,* 122 Wis. 2d. 266, 362 N.W.2d 149 (1985), that his mother was acting as an agent of the

dant, without a word of protest, accompanied the officers to the police station, the defendant by his behavior manifested his consent to go with the officers. Consequently, we hold that no seizure of the defendant occurred for fourth amendment purposes when the defendant went with the police officers to the police station for questioning.

## WHETHER THE POLICE VIOLATED THE DEFENDANT'S *MIRANDA* RIGHTS

### I. *The Defendant's Statement To Officer Edge*

The circuit court and the court of appeals in this case found that the defendant's statement to Officer Edge was volunteered. On review, we are bound by the circuit court's findings of historical facts unless they are contrary to the great weight and clear preponderance of the evidence. *State v. Turner,* 136 Wis. 2d 333, 343, 401 N.W.2d 827 (1987). This court is not bound, however, by the lower courts' determination of the ultimate issue of whether the police violated the defendant's *Miranda* rights, which is a constitutional fact which this court determines independently. *Id.* at 344. We agree with the lower courts' determination that the defendant's statement to Officer Edge was volunteered and that the defendant's *Miranda* rights were not violated.

In *Miranda v. Arizona,* 384 U.S. at 479, the United States Supreme Court determined that the fifth and

police in directing him to accompany the officers to the police station. We disagree. The record is clear that the police did not ask the defendant's mother to direct the defendant to accompany them to the police station. Rather, the defendant's mother was acting on her own behalf when she so directed her son.

fourteenth amendments' prohibition against compelled self-incrimination[4] required that custodial interrogation be preceded by advice to an individual that he has a right to remain silent and that anything he says can be used against him in a court of law and that he has the right to the presence of an attorney and if he cannot afford an attorney, one will be appointed for him prior to any questioning. The Court in *Miranda* also indicated the procedures to be followed subsequent to the warnings. If the accused indicates that he wishes to remain silent, "the interrogation must cease." *Id.* at 474. The right of an accused to cut off questioning must be "scrupulously honored." *Id.* at 479; *Michigan v. Mosley,* 423 U.S. 96, 104 (1975). If the accused requests counsel, "the interrogation must cease until an attorney is present." *Miranda,* 384 U.S. at 474. Furthermore, a valid waiver of that right to counsel cannot be established by showing only that the accused responded *to* further police-initiated custodial interrogation even if the accused has been advised of his rights. *Edwards v. Arizona,* 451 U.S. 477, 484 (1981). Rather, an accused, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation

---

[4]The fifth amendment to the United States Constitution provides in relevant part as follows:

> No person ... shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law ....

The fourteenth amendment to the United States Constitution provides in relevant part as follows:

> Section 1. ... No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

by authorities until counsel has been made available to the accused, unless the accused himself initiates further communication, exchanges, or conversations with the police. *Id.* at 484–85.

Consequently, in deciding whether the defendant's *Miranda* rights were violated, we must first determine when and if the defendant invoked either his right to remain silent or his right to counsel. The defendant submits that he initially invoked his right to counsel at his house when his mother told the police they should contact the defendant's attorney.

The defendant's position is without merit. As this court has recently held:

> Since the right to counsel and the right to remain silent are given by the constitution to the defendant, he alone can exercise those rights. Neither his family nor his attorney are threatened with accusations, nor do they have the defendant's knowledge of the case, including the defendants' knowledge of his own guilt or innocence, nor are they subject to the pain of the defendant's possibly guilty conscience. Therefore, no one but the accused can make the decision to make a statement to the police or to ask for the assistance of counsel in making his decision.

*State v. Hanson,* 136 Wis. 2d 195, 213, 401 N.W.2d 771 (1987).

The defendant next argues that he personally requested counsel at his house, when he asked his mother, on his way up the stairs from the basement, to contact his attorney. The defendant maintains that two officers were nearby when he made this statement, and, under *State v. Middleton,* 135 Wis. 2d 297, 309, 399 N.W.2d 917 (Ct. App. 1986), a communication of a desire for counsel to a third person that is understood

786

as a request for counsel by a police bystander is sufficient to constitute an invocation of the right to counsel.

Because invoking the right to counsel is an expression of the accused's desire to deal with the police only through counsel, that desire must be communicated to the police. *Neuenfeldt v. State,* 29 Wis. 2d 20, 24, 138 N.W.2d 252 (1965), *cert. denied* 384 U.S. 1025 (1966); *Middleton,* 135 Wis. 2d at 308. Consequently, in *Middleton,* 135 Wis. 2d at 309, the court of appeals held that:

> Although the suspect will usually communicate the desire for counsel directly to the police, we see no reason why indirect communication, such as to a police bystander, should be ineffective so long as the suspect has reason to believe the communication is effective. That is, the suspect must have some basis for believing that the bystander, as well as the person directly addressed, will understand that the suspect wants counsel. A suspect cannot expect the police to honor his or her desire for counsel unless the suspect has a reasonable basis for believing that the police realize that he or she has the desire.

In the case before this court, the defendant never testified that he had reason to believe that the communication with his mother was effective to impart to the officers an understanding that he wanted counsel. Furthermore, the police bystanders in this case expressly disclaimed any recollection of hearing the defendant ask his mother to contact his attorney. Consequently, we find that the defendant's statement to his mother asking her to contact the defendant's attorney was not an effective invocation of the defendant's right to

counsel because, on the basis of the record before us, the defendant could not have had a reasonable basis for believing that the officers realized that the defendant had the desire for counsel.

The defendant next contends that he invoked his right to silence when he refused to admit knowledge of the incident to Detective Markley. A defendant's disclaimer of any knowledge of the death of a victim does not constitute an invocation of the defendant's right to silence. *See Fare v. Michael C.*, 442 U.S. 707, 727 (1979). Detective Markley testified that after he had administered the *Miranda* warnings to the defendant and had obtained an assurance from the defendant that he understood them, the defendant gave an express, affirmative response to the question whether he wished to speak to Detective Markley. Detective Markley then told the defendant he thought that the defendant knew something about the homicide of Scott Alf, to which the defendant replied, "No, I don't." We find that the defendant did not invoke his right to remain silent by merely responding to Detective Markley's statement in the negative.

The defendant also contends that he invoked his right to counsel when Officer Edge attempted to question him. We agree that the defendant invoked his right to counsel when Officer Edge attempted to question him. However, we also find that Officer Edge did not continue to question the defendant about the incident after the defendant requested his attorney. Rather, Officer Edge immediately attempted to contact the defendant's attorney. Although the initial attempt to contact the defendant's attorney was unsuccessful, telephonic communication between the defendant and his attorney was established shortly thereafter. After

788

the defendant told Officer Edge that his attorney told him not to talk, Officer Edge telephoned a juvenile intake worker to arrange for the defendant's processing. The defendant does not dispute this sequence of events, but argues that during the time Officer Edge was making the arrangements to process the defendant, Officer Edge continued to make "small talk" with the defendant regarding school and his parents, thereby warranting suppression of the defendant's statement to Officer Edge under *Edwards*.

We disagree. The United States Supreme Court in *Edwards* held "that an accused ... having expressed his desire to deal with the police only through counsel, is not subject to further *interrogation* by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484–85 (emphasis added). The Court has defined the term "interrogation" under *Miranda* as referring not only to express questioning, but also to any words or actions on the part of the police, other than those normally attendant to arrest and custody, that the police should know are reasonably likely to elicit an incriminating response from the suspect. *Rhode Island v. Innis,* 446 U.S. 291, 300–01 (1980).

We find that Officer Edge's "small talk" with the defendant about school and his family was not interrogation within the meaning of *Miranda* because Officer Edge's conversation with the defendant was not reasonably likely to elicit an incriminating response from the suspect and, in fact, did not. Therefore, we hold that the defendant's statement to Officer Edge was not the product of any interrogation conducted after the defendant had invoked his right to counsel, but rather was

the product of an unsolicited, wholly spontaneous, volunteered action on the defendant's part. Consequently, we find that the defendant's *Miranda* rights were not violated and that the defendant's statement to Officer Edge was properly admitted.

II. *The Defendant's Statement To His Father Regarding the Location Of the Murder Weapon.*

The defendant maintains that the evidence of the location of the murder weapon should be suppressed because the defendant's father was acting as an agent of the police when he initiated further interrogation of the defendant after the defendant had invoked his right to counsel. Assuming arguendo that the defendant's father was acting as an agent of the police when he ascertained the location of the murder weapon, we nevertheless find no violation of the defendant's *Miranda* rights. Under the *Edwards* rule, the defendant's invocation of his right to counsel during his questioning by Officer Edge barred further interrogation by the authorities or their agents until counsel was made available to the defendant, unless the defendant "himself initiates further communication, exchanges, or conversations with the police." *Edwards,* 451 U.S. at 484–85. The defendant did initiate further communication with the police when he made his statement to Officer Edge; therefore, we must determine whether the defendant had validly waived his right to counsel when he spoke with his father. *Turner,* 136 Wis. 2d at 347.

An accused waives the right to counsel when there is a "voluntary, 'knowing and intelligent relinquishment or abandonment of a known right or privilege.'" *Id.,* citing *Edwards,* 451 U.S. at 482. An important factor in the "knowing and intelligent" analysis deals with the question of whether the defendant did in fact reopen the dialogue with police subsequent to the

790

initial invocation of the right to counsel. *Turner,* 136 Wis. 2d at 348; *see Edwards,* 451 U.S. at 486 n. 9.

We conclude, on the basis of the record before us, that the defendant voluntarily, knowingly, and intelligently waived his right to counsel. The defendant was given his *Miranda* warnings, in both written and oral form. The defendant verbally acknowledged that he understood his rights. The defendant also signed a waiver form which indicated that he understood his constitutional rights. The defendant spoke to his attorney on two occasions. Finally, the defendant, after invocation of his right to counsel, initiated further communication with the police. Therefore, we hold that the defendant was properly subject to further interrogation under the *Edwards* rule and that the evidence of the location of the murder weapon was properly admitted.

## WHETHER THE CIRCUIT COURT ERRED IN REFUSING TO INSTRUCT THE JURY ON THE LESSER-INCLUDED OFFENSE OF SECOND-DEGREE MURDER

While the circuit court is given broad discretion with respect to the submission of jury instructions, when the issue is whether the evidence adduced at trial permits the giving of a lesser-included offense instruction, a question of law is presented. *State v. Michels,* 141 Wis. 2d 81, 95, 414 N.W.2d 311 (Ct. App. 1987). This court decides questions of law independently, without deference to the trial court or the court of appeals. *Contempt in State v. Dewerth,* 139 Wis. 2d 544, 552, 407 N.W.2d 862 (1987).

A circuit court has the duty to accurately give to the jury the law of whatever degree of felonious homicide the evidence tends to prove and no other. *State v. Stortecky,* 273 Wis. 362, 369, 77 N.W.2d 721 (1956). It is error for a court to refuse to instruct the jury on an issue which is raised by the evidence or to give an instruction on an issue which finds no support in the evidence. *Lutz v. Shelby Mutual Ins. Co.,* 70 Wis. 2d 743, 750, 235 N.W.2d 426 (1975). The submission of a lesser-included offense is proper *only* when there are reasonable grounds in the evidence both for acquittal on the greater charge and conviction on the lesser offense. *Hawthorne v. State,* 99 Wis. 2d 673, 682, 299 N.W.2d 866 (1981). In applying this test, the evidence is to be reviewed in the light most favorable to the defendant. *Id.* at 683–84.

We note, however, that:

> To give an instruction on a lesser included offense when the commission of that lesser included offense is not reasonably shown by the evidence is no favor to a defendant. The inclusion of a doubtful lesser included offense is likely to result in a jury's compromise to the detriment of the defendant. Numerous cases arise in which the proper alternative for the jury is either the conviction on the major crime or a complete acquittal. To superfluously add to the verdict a lesser included offense may well in some cases result in the defendant being found guilty of that offense when a verdict of not guilty should have been returned.

*Ross v. State,* 61 Wis. 2d 160, 170, 211 N.W.2d 827 (1973).

We conclude, after reviewing the record, that there is not a reasonable ground in the evidence for either

acquittal on the greater charge of first-degree murder or for conviction on the lesser charge of second-degree murder. In regard to acquittal on the charge of first-degree murder, we find that the evidence, even when viewed most favorably to the defendant, leaves no reasonable doubt that, at the time the defendant shot the victim, the defendant had the requisite intent to kill to find the defendant guilty of first-degree murder.

The defendant shot the victim three times. Two of the bullets entered the victim's back, one approximately nine centimeters below the right shoulder blade, the other approximately seven centimeters below the right shoulder blade. One of the bullets that entered the victim's back hit his liver and diaphragm. The other bullet struck the victim's heart and lung. The third bullet entered the right top of the victim's head and traveled downward to the floor of the mouth, where it angled to the left and exited through the left jaw area. The cause of the victim's death was the gunshot wounds to his heart and his brain.

As this court has previously noted, when one intentionally points a loaded gun at a vital part of the body of another and discharges it, it cannot be said that he did not intend the natural, usual, and ordinary consequences. *Johnson v. State,* 85 Wis. 2d 22, 33, 270 N.W.2d 153 (1978). Therefore, based on the nature of the injuries sustained by the victim as the direct result of the three shots fired by the defendant into the body of the victim, we conclude that there is no reasonable ground in the evidence for acquittal of the defendant on the charge of first-degree murder.

In regard to reasonable grounds in the evidence to support a conviction on the charge of second-degree murder, the defendant argues that there was evidence

793

supporting the view that the shooting was accidental and that the defendant only intended to scare the victim. The defendant contends that the evidence supporting the view that the shooting was accidental is the defendant's assertion in his statement to Officer Edge that the rifle went off accidentally and the testimony of Troy Oltrogge which indicated that prior to the shooting, the defendant told Oltrogge that he intended to scare the victim.

We find that the defendant's assertions that the rifle went off accidentally and that he only intended to scare the victim are insufficient to support a conviction of the defendant on the lesser-included offense of second-degree murder. The defendant's assertions are not reasonable grounds for conviction of second-degree murder in light of the evidence adduced at trial concerning the nature of the weapon used by the defendant, the timing of the shots fired by the defendant, and the injuries sustained by the victim. More specifically, the weapon the defendant employed in shooting the victim was a .22–caliber semiautomatic rifle. By definition, a semiautomatic rifle requires that the trigger be pulled each time a bullet is fired. *See* Webster's New Collegiate Dictionary 1052 (1977). In addition, a witness who heard the shots fired testified that the shots were spaced approximately one or two seconds apart. Finally, two of the bullets fired by the defendant at the victim entered the victim's back and traveled inward, while the third bullet entered the top of the victim's head and traveled downward, thereby indicating a passage of time between the shots fired at the victim's back and the shot fired at the victim's head.

After reviewing the preceding evidence, we conclude that the evidence and the reasonable inferences

therefrom are insufficient to support a conviction of the defendant on the lesser-included offense of second-degree murder. Consequently, we affirm the holding of the court of appeals that the circuit court did not err in refusing to instruct the jury on the lesser-included offense of second-degree murder.

In conclusion, we find that no seizure of the defendant occurred for fourth amendment purposes when the defendant went with the police officers to the police station for questioning, that the police did not violate the defendant's *Miranda* rights, and that the circuit court did not err by refusing to instruct the jury on the lesser-included offense of second-degree murder.

*By the Court.*—The decision of the court of appeals is affirmed.

HEFFERNAN, CHIEF JUSTICE (concurring). I concur in the result because I believe the effect of any fourth amendment violation in this case was so attenuated so as to be harmless. The state concedes that there was no probable cause to justify a seizure of Kramar at his home. The question is whether there was a seizure.

It is apparent to me that there was a seizure in this case. Kramar was in police custody, for fourth amendment purposes, from the time he was taken to the police station for questioning. Kramar was sixteen years of age at the time, had low intelligence and had been placed in a school program for emotionally disturbed children. Nevertheless, the test of police custody is objective: whether a reasonable person under these circumstances would believe that he was free to leave. *State v. Koput,* 142 Wis. 2d 370, 380, 418 N.W.2d 804 (1988).

The police in this case spent twenty to thirty minutes convincing Kramar's parents that they should permit Kramar to be taken to the station. Kramar's

parents called him upstairs and directed him to go with the police. No one asked Kramar whether he wanted to go. Kramar was patted down before he got into the police car. During the ride, Kramar was informed that, when they arrived at the station, he would be informed of his rights against self-incrimination and a gunpowder test would be performed on his hands. At the station, Kramar was read his rights, the gunpowder test was performed (without his permission), and police questioning commenced. Under these circumstances, a reasonable person would believe that he was under arrest. I therefore conclude that this case presents a seizure without probable cause, a violation of the fourth amendment.

I am authorized to state that JUSTICES ABRA-HAMSON and BABLITCH join in this concurrence.