STATE of Wisconsin, Plaintiff-Respondent,†

v.

Christopher ANSON, Defendant-Appellant.

Court of Appeals

*No. 03–1444–CR. Submitted on briefs April 22, 2004.—Decided July 21, 2004.*

2004 WI App 155

(Also reported in 686 N.W.2d 712.)

† Petition to review granted 12-15-04.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Steven J. Watson* of *Steven J. Watson Law Office*, Lyndonville, Vermont.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Christopher G. Wren*, assistant attorney general, and *Peggy A. Lautenschlager*, attorney general.

Before Anderson, P.J., Brown and Snyder, JJ.

¶ 1. SNYDER, J. Christopher Anson appeals from

a judgment of conviction and an order affirming his conviction for second-degree sexual assault of a child in violation of Wis. Stat. § 948.02(2) (2001–02).[1] This is the second time that Anson's case is before us. In *State v. Anson*, 2002 WI App 270, 258 Wis. 2d 433, 654 N.W.2d 48, we discussed the legality of statements that the State obtained from Anson and introduced at trial. *Id.*, ¶ 21. We held that the State violated Anson's Sixth Amendment right to counsel when it undertook its interrogation, and accordingly, the trial court erred when it failed to suppress Anson's statements. *Id.* We remanded the matter for an evidentiary hearing to determine whether a link existed between the State's introduction of inadmissible statements and Anson's decision to testify at trial. *Id.*, ¶ 29. Anson argues that the trial court failed to follow our directions on remand and that the State failed to prove that its use of the inadmissible statements did not impel Anson to take the stand. We agree and conclude that Anson is entitled to a new trial.

## FACTS

¶ 2. We have set forth the historical facts of this case in our previous opinion. *Id.*, ¶¶ 2–7. Those relevant to this appeal are repeated here, with additional facts provided as necessary. On July 26, 2000, the State issued an arrest warrant for Anson and charged him with three counts of sexual contact with a child under the age of sixteen in violation of Wis. Stat. § 948.02(2).

¶ 3. In early August, an officer from the Fontana police department contacted the Orange County California sheriff and asked for assistance in obtaining a

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

statement from Anson. On August 7, the Orange county investigator received a fax that contained an eight-page narrative, a copy of the criminal complaint against Anson, and a Xerox of a photograph of Anson and the victim. The next day, the investigator and his partner went to Anson's workplace, both to get a statement from him regarding an alleged sexual assault that had occurred in Wisconsin and ultimately to arrest him. Anson agreed to speak with the investigators.

¶ 4. During the interview, one of the investigators asked Anson why the victim would make up such a story and Anson stated that the victim had some grounds for the allegation. Anson then admitted to the investigators that the victim, while on the couch, took his hand and placed it over her clothes on her vagina and that he left his hand there for a period of time. Anson also told the investigators that from his point of view no other incidents occurred. He also stated that he had lied to his wife about the incident, telling her that the victim had taken his hand and put it on her breast rather than on her vagina. After the interview, the investigators placed Anson under arrest.

¶ 5. Prior to trial, Anson moved to suppress the statement he gave to the California investigators. The trial court denied the motion. Anson filed an interlocutory appeal of the denial, which was rejected. At trial, Anson's statement was introduced through the testimony of one of the California investigators.

¶ 6. Anson subsequently took the stand and testified that the victim had taken his hand and placed it over her clothes on her vagina. He disputed the California investigator's characterization that he had left his hand there for more than a couple of seconds. Anson also testified about lying to his wife about the incident, explaining that he had tried to minimize the event to

avoid upsetting her. Anson denied the allegations related to two other incidents reported by the victim.

¶ 7. A jury convicted Anson on count three of the information, second-degree sexual assault of a child in violation of Wis. Stat. § 948.02(2), which represented the incident on the couch. The jury found Anson not guilty on counts one and two of the information.

¶ 8. Anson appealed the conviction. We concluded that the statement Anson made to the California investigators violated his Sixth Amendment right to counsel and should have been suppressed. *Anson*, 258 Wis. 2d 433, ¶ 21. In addition, we concluded that if, by testifying, Anson waived his right against self-incrimination, any error created by the illegally obtained statement would be harmless. *Id.*, ¶ 26. We determined that a waiver analysis under *Harrison v. United States*, 392 U.S. 219 (1968), and *State v. Middleton*, 135 Wis. 2d 297, 302, 399 N.W.2d 917 (Ct. App. 1986), was required, and we remanded the matter to the trial court with these instructions:

> We direct the trial court on remand to hear evidence and make findings of historical fact concerning whether Anson testified in order to overcome the impact of the incriminating statements he made to the investigators. The State bears the burden of showing that its use of the unlawfully obtained statements did not induce Anson's testimony. Further, even if the trial court finds that Anson would have testified anyway, *Harrison* dictates that for the State to meet its burden of proving that Anson's testimony was obtained by means sufficiently distinguishable from the underlying constitutional violation, it must dispel the natural inference that Anson would not have repeated the inculpatory statements when he took the stand. If the trial court finds that a link in fact exists between the State's constitutional violation and Anson's subsequent

decision to take the stand and repeat the inculpatory statements, Anson has not waived his right against self-incrimination and is entitled to a new trial.

*Anson*, 258 Wis. 2d 433, ¶ 29 (citations omitted).

¶ 9. On remand the State argued that Anson's testimony presented information outside the scope of the California statement and therefore the inducement for testifying was distinguishable from the inadmissible statement. The State also asserted that the prosecution witnesses were so credible that Anson had no choice but to take the stand to rebut their testimony. The court ruled that Anson would have testified even if the inadmissible statement had been suppressed, and that there were independent, distinguishable reasons for his decision to take the stand. Anson appeals.

## DISCUSSION

¶ 10. The ultimate issue here is whether Anson waived his constitutional protection against self-incrimination when he testified at trial. To make that determination, *Harrison* requires a two-part analysis. First, the court must determine whether the trial testimony was impelled by the prosecution's wrongful use of the illegally obtained confession. *Harrison*, 392 U.S. at 224. If not, the court must then decide whether the incriminating statements would have been repeated in the trial testimony had the illegally obtained confession been suppressed. *Id.* at 225–26. In other words, Anson's decision to testify and the content of his testimony are to be scrutinized.

¶ 11. On remand the court found that the State's use of Anson's illegally obtained statement did not

impel him to testify at trial. The issue before us is whether this finding is in error. We apply a two-step standard of review to issues of constitutional fact. We will not set aside a trial court's finding of historical fact unless it is clearly erroneous. Wis. Stat. § 805.17(2). Our review of a constitutional fact on the grounds of established historical fact, however, is de novo. *State v. Turner*, 136 Wis. 2d 333, 344, 401 N.W.2d 827 (1987).

¶ 12. The State argues that at the evidentiary hearing the court properly applied a "totality of the circumstances" framework for its ruling. We agree with the State that similar postconviction hearings provide an opportunity to look at the entire record when assessing whether error occurred. *See, e.g., State v. Johnson*, 153 Wis. 2d 121, 130, 449 N.W.2d 845 (1990) (where the court applied a "totality of the circumstances" analysis at a *Machner*[2] hearing on ineffective assistance of counsel); *see also State v. Bangert*, 131 Wis. 2d 246, 275, 389 N.W.2d 12 (1986) (The State may examine the defendant or the defendant's counsel to shed light on the defendant's understanding or knowledge necessary to enter a plea, and may also use the entire record to demonstrate that the defendant knew that constitutional rights would be waived.). We do not agree, however, that the evidentiary hearing court can stray from the record and consider intangible or speculative information from the trial. We hold that at an evidentiary hearing under *Harrison/Middleton*, the State may examine the defendant or defendant's counsel regarding the defendant's reason for testifying, and may use the entire record to meet its burden of showing

---

[2] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

that its use of an unlawfully obtained statement did not induce the defendant's trial testimony.

██

¶ 13. We now turn to the evidentiary hearing. Under *Harrison*, when a defendant takes the stand in order to overcome the impact of an illegally obtained statement, his or her testimony is tainted by the same illegality that rendered the statement inadmissible. *Middleton*, 135 Wis. 2d at 302. The State must prove that Anson's testimony was obtained "by means sufficiently distinguishable" from the underlying illegality "to be purged of the primary taint." *See Harrison*, 392 U.S. at 226 (citing *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).

¶ 14. The State called one witness: Jeffrey Recknagel, its primary investigating officer. Recknagel testified that Anson did not have any criminal history and that Anson was calm and articulate on the taped California interview. He further testified as to the appearance and demeanor of several State's witnesses during the trial.[3] The State argued that

> [t]he issue is: did [Anson] testify only because this statement was put into evidence, or because of other factors; such as, all of these other witnesses who, if they didn't come across at all credible, it's obvious he wouldn't have bothered or cared to testify to rebut their testimony; however, if they came across as clean cut, articulate, and credible people, that would add to the

---

[3] For example, Recknagel testified that one witness against Anson was "[v]ery calm, collect, fully adult . . . very proper [and] well-dressed." Anson objected to Recknagel's testimony, arguing that Recknagel was not competent to testify on witness credibility. The court did not explicitly rule on the objection, but allowed the testimony to continue.

state's argument that he would have had more reason to testify to rebut their testimony.

¶ 15. The State also referenced trial transcripts to demonstrate that Anson announced during his opening statement that he would testify. Furthermore, the State argues, Anson testified about matters outside the scope of the California statement, including his family history and his relationship with the victim. Finally, the State argued that because Anson's testimony was the same as his California statement, he did not testify to rebut any of its contents.

¶ 16. Anson called one witness, his trial attorney Larry Steen, whose undisputed testimony was that Anson's trial testimony was induced by the admission of Anson's illegally obtained confession. *See Harrison*, 392 U.S. at 224 (The question is "whether the petitioner's trial testimony was in fact impelled by the prosecution's wrongful use of his illegally obtained confessions."). Steen testified that he knew of the California interview and that he moved for suppression of the statement; however, the court ruled that the statement was admissible. Steen then explained the advice he had given his client about testifying at trial:

> My recommendation to [Anson] was that he was going to have to testify at the jury trial because of the fact that the statement was going to be entered in as evidence . . . . On the day of his testimony, I was approached by . . . [Anson's] stepfather, who told me that [Anson] did not want to testify . . . . I then found [Anson] either in the courtroom or the hall. I don't remember. I asked [Anson] what was wrong. He said he did not want to testify. I told him he absolutely had to because of the damaging effect of that statement . . . . He told me he would follow [my] advice.

On cross-examination, Steen responded as follows:

843

Q ... What sort of factors did you take into consideration in your discussions with the defendant in deciding whether or not he would take the stand?

A The statement was the sole reason. The statement was the key piece of evidence, except for what [the victim] said happened. That was the only evidence the state had.

¶ 17. Anson points out that by the time he made his opening statement, his motion to suppress had been denied and his attempt at an interlocutory appeal on that decision had been unsuccessful. Anson further observes that the State's opening comments broadcast to the jury that it would use the California statement against him. During its opening statement, the State told the jury that Anson admitted the victim might have some grounds for her allegation. The State also told the jury that it would hear Anson's admission that when the victim took his hand and put it on her vagina, he froze for three minutes. Finally, the State told the jury that Anson had lied to his wife about the incident. Steen testified that the defense felt "the case turned on the statement given in California."

¶ 18. At the conclusion of the evidentiary hearing, the court ruled that there was an "independent distinguished basis" for Anson's testimony other than the California statement. The court relied on the following findings of historical fact:[4] (1) In the taped statement, Anson admitted to one incident of touching but explained it by the concept of consent; (2) In addition to Anson's statement, the State offered the testimony of

---

[4] Although not explicitly identified as findings of fact, the court incorporated these statements into its oral ruling at the evidentiary hearing.

the victim and other witnesses; (3) Anson had no criminal record; (4) Anson's trial testimony was substantially the same as the California statement; and (5) Steen told Anson he had to take the stand.

¶ 19. The record reveals that the court also considered facts not in evidence at trial or the hearing. The court referenced its observations of family distress in the courtroom during the trial, as well as trial witness credibility to make its findings. These were not appropriate considerations. By straying into intangible aspects of the trial, the evidentiary hearing court violated Anson's Sixth Amendment right to confront witnesses against him. Specifically, the court based its ruling in part on the following observation:

> Quite honestly, [Anson testified] also perhaps to have some kind of compatibility with what he had told his wife before. That might not have been known to the state, but that might have been something he had to face the family to get up there and take the stand. And I saw the whole family scenario here as a trial Judge. So I know there was a tremendous division, and reason for [Anson] to take the stand and deny or explain it.

In effect, the court speculated on the family's influence without providing Anson with an opportunity to confront the family members on the issue. Based on its findings, the court stated that Anson "really had no other reason not to testify" because he had no criminal record to hide and he did not substantially change the story he told the investigators. The court concluded, "I'm making my determination that it's not linked in the sense that is set forth in the Harris(sic) case, which I believe was adopted . . . and that's it."

▬

¶ 20. We will find an erroneous exercise of discretion when the record shows that the lower court failed to exercise its discretion, the facts fail to support the court's decision, or we find that the court applied the wrong legal standard. *State v. Black*, 2001 WI 31, ¶ 9, 242 Wis. 2d 126, 624 N.W.2d 363. Here, we have several concerns regarding the exercise of discretion.

▬

¶ 21. First, the court mischaracterized the inquiry. The State's burden was to prove that its use of illegal evidence did not induce Anson to testify. *Anson*, 258 Wis. 2d 433, ¶ 29. The court's determination that Anson "really had no other reason not to testify" reflects the wrong legal standard. The *Harrison* Court acknowledged that there may be many reasons for a person to take the stand. *Harrison*, 392 U.S. at 224 ("It is, of course, difficult to unravel the many considerations that might have led the petitioner to take the witness stand . . . . But, having illegally placed his confessions before the jury, the Government can hardly demand a demonstration by the petitioner that he would not have testified as he did if his inadmissible confessions had not been used."); *see also United States v. Pelullo*, 173 F.3d 131, 136 (3rd Cir. 1999) ("The *Harrison* Court recognized the importance of examining that causal link to determine whether the government's use of a defendant's illegal confession at trial induced the defendant to take the stand to testify and, in doing so, make a number of admissions that might not have come out but for that testimony. While acknowledging that a number of factors inevitably play a part in a defendant's decision to testify, the Court concluded that the government had failed to prove that the defendant's testimony was obtained by means sufficiently distinguishable

from the underlying constitutional violation."). Had Anson's inadmissible statement been properly suppressed, he had a compelling and constitutionally sound reason not to testify: the Fifth Amendment protection against self-incrimination. More importantly, he would have had the opportunity to weigh that protection against the benefits of testifying to refute *legally* introduced evidence.

¶ 22. Second, the court did not explicitly identify the historical facts underpinning its decision. We were left to infer from the evidentiary hearing record which facts may have influenced the court's ruling. We are particularly concerned that the court resorted to facts not in evidence to reach its conclusion. Specifically, the court's characterization, and apparent consideration, of the family's courtroom interactions during trial deprived Anson of his Sixth Amendment right to confront witnesses against him. Here, the court speculated on Anson's motive for testifying without any facts to support the inferences drawn and without an opportunity for Anson to cross-examine those whose behavior apparently influenced the court.

¶ 23. Finally, the court did not address the second part of the *Harrison* test: whether Anson would have repeated the incriminating statements on the stand had the California statement been properly suppressed. *See Harrison*, 392 U.S. at 225. Even if Anson would have chosen to testify, it is unlikely that he would have said that the victim "may have some grounds for the allegation," or referenced a three-minute time frame for the touching episode, or admitted lying to his wife about the incident. The State has not, therefore, defeated the "natural inference" that "no testimonial admission so

damaging would have been made if the prosecutor had not already spread the petitioner's confessions before the jury." *Id.* at 225–26.

¶ 24. Interestingly, the only direct evidence of Anson's inducement to testify came from Steen's testimony at the hearing. The State did not call Anson to refute Steen's testimony, nor did it undertake to call Steen's credibility into question. We acknowledge that the trial court has no obligation to believe everything a witness says, and when the record reveals inconsistencies within a witness's testimony or between one witness and another, the court as fact finder determines the weight and credibility accorded to the testimony. *State v. Daniels*, 117 Wis. 2d 9, 17, 343 N.W.2d 411 (Ct. App. 1983). Here, however, the court was not presented with any inconsistencies from which to choose. The State failed to present any testimony or other evidence to rebut Steen's statements, nor did the State undertake to challenge Steen's credibility. The court simply decided, "I just can't put that much weight on that as a link."

¶ 25. Clearly, having had his own inculpatory statements submitted to the jury, Anson was "powerfully impelled to explain them: after all, no one else was in a position to do so." *See Pool v. State*, 780 S.W.2d 350, 351 (Ark. App. 1989) ("The *Harrison* Court placed a great emphasis on the powerful inducement to testify which arises when a defendant's confession is introduced into evidence."). Our independent review of the record allows us to draw only one reasonable inference: that the State's use of the illegally obtained California statement at trial impelled Anson to take the stand and testify in rebuttal. We may decide which

inferences may be reasonably drawn from the facts. *Middleton*, 135 Wis. 2d at 321. Determining the reasonableness of an inference is a "recognized appellate function." *Id.* If only one reasonable inference is available, the drawing of that inference is a question of law. *Pfeifer v. World Serv. Life Ins. Co.*, 121 Wis. 2d 567, 571, 360 N.W.2d 65 (Ct. App. 1984). The competing inference, that Anson was not impelled by the State's illegal use of his statement, is unreasonable in light of the facts.

¶ 26. At the close of the hearing, the court reinstated Anson's conviction, ruling that the error was harmless. Because we disagree with the court's conclusion that Anson waived his right against self-incrimination, our previous harmless error analysis applies. We resolved this issue, pending the resolution of the waiver issue, as follows:

> We cannot conclude that the error was harmless beyond a reasonable doubt . . . . [W]e note that the only count on which the jury convicted Anson is the count involving the incident about which he had made the incriminating statements. In the two other counts, where the sole evidence consisted of testimony, the jury found Anson not guilty. Based on our reading of the record, we cannot conclude that a rational jury would have found Anson guilty absent his statements.

*Anson*, 258 Wis. 2d 433, ¶ 31. For this reason, we hold that the State's original violation of Anson's constitutional right to counsel is not harmless.

## CONCLUSION

¶ 27. We conclude that at an evidentiary hearing under *Harrison/Middleton*, the State may examine the defendant or defendant's counsel regarding the defen-

dant's reason for testifying, and may use the entire record to meet its burden of showing that its use of an unlawfully obtained statement did not induce the defendant's trial testimony. We further conclude that the State did not meet its burden to prove that "its use of the unlawfully obtained statements did not induce Anson's testimony." *Anson*, 258 Wis. 2d 433, ¶ 29. Also, at the evidentiary hearing the court failed to complete the second step of the *Harrison* analysis which requires the court to determine whether the State has dispelled the natural inference that even if the defendant takes the stand, he or she will not repeat the inculpatory statements. *Anson*, 258 Wis. 2d 433, ¶ 29. Finally, we conclude that Anson did not waive his Fifth Amendment protection against self-incrimination when he testified because he took the stand to overcome the impact of his illegally obtained and used confessions. *See Harrison*, 392 U.S. at 223 (If a defendant takes the stand "in order to overcome the impact of confessions illegally obtained and hence improperly introduced, then his testimony was tainted by the same illegality that rendered the confessions themselves inadmissible."); *see also Middleton*, 135 Wis. 2d at 317 ("If [the defendant's] testimony was, in fact, impelled by the prosecution's use at the trial of his illegally obtained confessions, then his testimony is as tainted as his confessions."). Anson's conviction on count three is therefore reversed and he is entitled to a new trial.

*By the Court.*—Judgment and order reversed and cause remanded with directions.