STATE of Wisconsin,
Plaintiff-Respondent-Petitioner,

v.

Christopher ANSON, Defendant-Appellant.

Supreme Court

*No. 2003AP1444–CR. Oral argument April 28, 2005.
—Decided June 29, 2005.*

2005 WI 96

(Also reported in 698 N.W.2d 776.)

631

For the plaintiff-respondent-petitioner the cause was argued by *Christopher G. Wren,* assistant attorney general, with whom on the briefs was *Peggy A. Lautenschlager,* attorney general.

For the defendant-appellant there was a brief by *Steven J. Watson* and *Downs Rachlin Martin PLLC,* St. Johnsbury, VT, and oral argument by *Steven J. Watson.*

¶ 1. JON P. WILCOX, J. The State seeks review of a published court of appeals decision, *State v. Anson,* 2004 WI App 155, 275 Wis. 2d 832, 686 N.W.2d 712 [hereinafter "*Anson II*"]. The court of appeals reversed Christopher Anson's (Anson's) judgment of conviction for second-degree sexual assault of a child and an order of the Walworth County Circuit Court, James L. Carlson, Judge, affirming that conviction and remanded for a new trial. *Id.,* ¶ 1. For the reasons discussed below, we affirm the court of appeals' decision, which remanded the case for a new trial.

## I. FACTUAL BACKGROUND
## AND PROCEDURAL POSTURE

¶ 2. This case has a lengthy factual and procedural background. The relevant facts are not in dispute, and in the interest of judicial economy, we set forth the factual background of this case as stated by the court of appeals in Anson's original appeal:

> On July 26, 2000, the State issued an arrest warrant for Anson. On July 26, the State charged Anson with three counts of sexual contact with a child under the age of sixteen in violation of Wis. Stat. § 948.02(2) (1999–2000). Each count of the complaint is distin-

guished by time and place. Counts one and two relate to an incident allegedly occurring "on a glider type chair" on the "porch of the home." Count three relates to the allegation that "the defendant later came back downstairs" and "touched [the victim's] vagina while she was lying on a couch."

In early August, an officer from the Fontana police department contacted the Orange County California sheriff and asked for assistance in getting a statement from Anson. On August 3, the Orange county investigator who initiated the discussion with Anson first learned about the warrant for Anson's arrest. On August 7, the officer sent a fax that contained an eight-page narrative, a copy of the criminal complaint, and a Xerox of a photo of Anson and the victim to the investigator. On August 8, the investigator and his partner went to Anson's workplace, both to get a statement from him regarding an alleged sexual assault that had occurred in Wisconsin and ultimately to arrest Anson. Anson agreed to speak with the investigators.

At the beginning of the interrogation, Anson asked, "I haven't been charged with anything yet," and the investigator responded, "Right." The investigator then asked Anson, "You understand you are not under arrest right now?" Anson responded affirmatively.

After a preliminary discussion, the interrogation turned to the circumstances surrounding the alleged contact between Anson and the alleged victim of the sexual assault. The investigator asked Anson why the victim would make up such a story and Anson stated that she had some grounds for the allegation. Anson then admitted to the investigators that the victim took his hand and placed it over her clothes on her vagina and he left his hand there for a period of time. Anson told the investigators that from his point of view nothing happened on the porch swing. After the interview, the investigators placed Anson under arrest.

635

Prior to trial, Anson filed a motion to suppress the statements he made to the investigators. The trial court denied the motion.[1] At trial, the inculpatory statements were introduced through the testimony of one of the investigators. Anson also took the stand at trial and testified, as he had told the investigators, that the victim had taken his hand and placed it on her vagina. Anson denied ever having put his hands up the victim's shirt or touching her breasts on the porch swing.

A jury convicted Anson on count three of the information, second-degree sexual assault of a child in violation of Wis. Stat. § 948.02(2). The jury found Anson not guilty on counts one and two of the information.

*State v. Anson,* 2002 WI App 270, ¶¶ 2–7, 258 Wis. 2d 433, 654 N.W.2d 48 [hereinafter "*Anson I*"].

¶ 3. On appeal, the court of appeals in *Anson I* held that "the State violated Anson's Sixth Amendment right to counsel when it undertook its interrogation, and accordingly, the trial court erred when it failed to suppress Anson's statements." *Id.,* ¶ 21. The court of appeals also considered "whether, by taking the stand, Anson waived his right against self-incrimination, thereby rendering any error harmless." *Id.,* ¶ 26.

¶ 4. As to the second issue, the court of appeals, relying on *Harrison v. United States,* 392 U.S. 219 (1968), and *State v. Middleton,* 135 Wis. 2d 297, 399 N.W.2d 917 (Ct. App. 1986), remanded for an eviden-

---

[1] The court of appeals rejected Anson's interlocutory appeal of the denial of his motion to suppress. *Anson II,* 2004 WI App 155, ¶ 5, 275 Wis. 2d 832, 686 N.W.2d 712. In his petition for leave to appeal the circuit court's order, Anson stated: "Admission of the statement will strategically force the defendant to testify despite his right of silence."

tiary hearing to determine whether the State's use of the illegally obtained statements induced Anson to take the stand in order to overcome the impact of those statements:

> We direct the trial court on remand to hear evidence and make findings of historical fact concerning whether Anson testified in order to overcome the impact of the incriminating statements he made to the investigators. The State bears the burden of showing that its use of the unlawfully obtained statements did not induce Anson's testimony. Further, even if the trial court finds that Anson would have testified anyway, *Harrison* dictates that for the State to meet its burden of proving that Anson's testimony was obtained by means sufficiently distinguishable from the underlying constitutional violation, it must dispel the natural inference that Anson would not have repeated the inculpatory statements when he took the stand. If the trial court finds that a link in fact exists between the State's constitutional violation and Anson's subsequent decision to take the stand and repeat the inculpatory statements, Anson has not waived his right against self-incrimination and is entitled to a new trial.

*Anson I,* 258 Wis. 2d 433, ¶ 29.

¶ 5. On remand, the circuit court held an evidentiary hearing, the contents of which were summarized by the court of appeals in *Anson II.* The State's sole witness was Jeffrey Recknagel, its primary investigating officer, who testified "that Anson did not have any criminal history and that Anson was calm and articulate on the taped California interview. He further testified as to the appearance and demeanor of several State's witnesses during the trial." *Anson II,* 275 Wis. 2d 832, ¶ 14. The State also introduced transcripts of the trial. *Id.,* ¶ 15. Anson's sole witness was his trial attorney, Larry Steen, who testified that the only rea-

637

son Anson testified was to counteract the effect of the illegally obtained confession. He testified that Anson did not wish to take the stand and did so only on his (Steen's) advice. Steen stated that aside from the testimony of the victim, the statement was the only piece of evidence the State possessed and that he told Anson it was absolutely necessary that he take the stand in order to counter the damaging effect of that statement. *Id.,* ¶ 16.

¶ 6. The State argued that Anson would have taken the stand despite the introduction of the illegally obtained statement because: 1) his attorney announced during opening statement that Anson would testify; 2) Anson testified about matters outside the California statement; 3) Anson's testimony was consistent with the California statement; and 4) the State's witnesses were very credible. *Id.,* ¶¶ 14–15. Anson, on the other hand, argued that he would not have testified but for the introduction of the illegally obtained statement because: 1) by the time of his opening statement his interlocutory appeal had already been denied; 2) the State announced in its opening statement that it would use the statement Anson gave to police in California; 3) the State told the jury that Anson admitted lying to his wife in the California statement; 4) the State told the jury that Anson admitted the victim may have had grounds for the allegations; and 5) the State told the jury that Anson admitted in the California statement that the victim placed his hand on her vagina and he left it there for three minutes. *Id.,* ¶ 17.

¶ 7. Following the hearing, the circuit court found and ruled as follows:

> I think the court's findings have to be, or I do make the following findings: *that [Anson] would have testi-*

*fied; that there was an independent distinguished basis
for his testimony other than the state's confession,* as it's
called a confession. First of all, the statement to the
police denied contact on the porch, and it did admit
touching, but explained it by the concept of consent.
*The distinguished reason here, in my opinion, is that
there was a whole host of other testimony here that the
state relied on:* the direct testimony of the victim, which
in detail listed the offenses complained of . . . . *But the
defendant really had no other reason not to testify:* such
as; a criminal record that would impeach his credibility.
And the fact of the matter is, when given the chance to
testify, he told substantially the same story as he told
the police officer, to explain then to the police officer
that it was consensual contact. We must assess the
defendant's reaction to the use of his confession at trial
on the basis of the information then available to him.
When he testifies he has a whole plethora of other
evidence against him, a very small play on his prior
statement that he must explain. He can, if he wishes, to
sit back and not take the stand. But regardless of Mr.
Steen's testimony, I know he didn't really say he
wouldn't take the stand or advise him to take the stand;
otherwise if he doesn't explain it, he's going to get
convicted. So, I mean in this case, we have that inde-
pendent line of testimony facing him at the time when
he must make the decision regardless of Mr. Steen's
testimony, that that was the reason. I just can't put that
much weight on that as a link. And again, it's not like
he's walking away from the statement he made before
telling a whole different story . . . .

. . . .

. . . I don't construe the case that if there was a link
as being there's a possibility or a whatever. I think the
state must establish that there is a substantial and
independent reason for his testifying. *And that the live
in court testimony of the niece I think is a compelling
reason to take the stand and have to testify. Quite*

639

*honestly, also perhaps to have some kind of compatibility with what he had told his wife before. That might not have been known to the state, but that might have been something he had to face the family to get up there and take the stand. And I saw the whole family scenario here as trial Judge. So I know there was a tremendous division, and reason for him to take the stand and deny or explain it.* If he didn't take the stand, he had a right to do that. But his credibility before the jury and the family, I think, you know, would have been strongly diminished, even if that would have been his attorney's advice; although I doubt it would have been. I didn't hear the attorney say that. I did hear the attorney say he didn't want to take the stand, and he told him he had to do it; he did say that.

. . . .

I'm making my determination that [Anson's testimony is] not linked in the sense that is set forth in the Harris (sic) case, which I believe was adopted in the other case, and that's it.

. . . .

Not a causal link for his testifying.

(Emphasis added.)

¶ 8. Therefore, the circuit court ruled that the admission of the California statement was harmless beyond a reasonable doubt. The circuit court entered an order on May 10, 2003, affirming the judgment of conviction. Anson again appealed and the court of appeals reversed.

¶ 9. The court of appeals began by addressing the proper scope of a *Harrison/Middleton* hearing and held that "at an evidentiary hearing under *Harrison/Middleton*, the State may examine the defendant or defendant's counsel regarding the defendant's reason

for testifying, and may use the entire record to meet its burden of showing that its use of an unlawfully obtained statement did not induce the defendant's trial testimony." *Anson II,* 275 Wis. 2d 832, ¶ 12. However the court of appeals held that it was improper for the circuit court to "stray from the record and consider intangible or speculative information from the trial." *Id.*

¶ 10. Addressing whether the State met its burden at the hearing, the court of appeals concluded that the circuit court applied the wrong legal standard by stating that "Anson 'really had no other reason not to testify[.]' " *Id.,* ¶ 21. Next, the court of appeals ruled it was improper for the circuit court to consider "the family's courtroom interactions during trial[.]" *Id.,* ¶ 22. The court of appeals also ruled that the circuit court failed to apply the second prong of the *Harrison* test and that "[e]ven if Anson would have chosen to testify, it is unlikely that he would have said that the victim 'may have some grounds for the allegation,' or referenced a three-minute time frame for the touching episode, or admitted lying to his wife about the incident." *Id.,* ¶ 23. The court of appeals further noted that the only direct evidence of why Anson testified came from the testimony of his attorney and that this testimony was not contradicted or rebutted.

¶ 11. Therefore, the court of appeals held: "Our independent review of the record allows us to draw only one reasonable inference: that the State's use of the illegally obtained California statement at trial impelled Anson to take the stand and testify in rebuttal. . . . " *Id.,* ¶ 25. As such, the court of appeals further held that "the State's original violation of Anson's constitutional right to counsel is not harmless." *Id.,* ¶ 26.

## II. ISSUES

¶ 12. Two issues are presented in this case. The first issue concerns the scope of a *Harrison/Middleton* hearing. The State argues that the court of appeals' decision in *Anson II,* by allowing the State to call the defendant and/or his attorney, violates the defendant's Fifth and Sixth Amendment rights. The State also asserts that it is not error for a circuit court to consider "intangibles" such as witness demeanor, credibility, and courtroom observations. Further, the State suggests that the court of appeals' decision in *Anson I,* setting forth the standard to be applied at such hearings, is inconsistent with *Harrison* and *Middleton.* The second issue is whether the State met its burden in proving that its introduction of Anson's statement to the California authorities was harmless beyond a reasonable doubt by demonstrating that Anson would have testified despite the introduction of the California "confession" and further would have repeated the incriminating statements contained in the "confession."

¶ 13. We hold that a *Harrison* hearing is not an evidentiary hearing and overrule the court of appeals' decision in *Middleton* to the extent it held a circuit court may take additional evidence at such a hearing. We hold that a *Harrison* hearing is a paper review during which a circuit court makes findings of historical fact based on the record. The circuit court should make findings of historical fact based on the *entire* record. While a circuit court may make credibility determinations based on material in the record when making its historical factual findings, it may not rely on its personal knowledge of events not appearing in the record. The circuit court thus may state that it found a witness' testimony at trial not credible or implausible in light of other testimony and evidence presented. However, the

circuit court may not state, for example, its opinion the witness was being intimidated by the presence of several well-known gang members in the courtroom, *if the presence and behavior of these individuals was not documented in the record.*

¶ 14.　Once a circuit court has made the requisite findings of historical fact, it must determine, as a matter of law, whether the State proved beyond a reasonable doubt that its prior constitutional violation did not impel the defendant to testify under the standards set forth in *Harrison.* A *Harrison* analysis is a two-part inquiry. First, the circuit court must consider whether the defendant testified "in order to overcome the impact of [statements] illegally obtained and hence improperly introduced[.]" *Harrison,* 392 U.S. at 223. Second, even if the court concludes that the defendant would have taken the stand, it must determine whether the defendant would have repeated the damaging testimonial admissions "if the prosecutor had not already spread the petitioner's confessions before the jury." *Id.* at 225–26.

¶ 15.　We conclude that the State has not proved beyond a reasonable doubt that Anson did not take the stand "in order to overcome the impact of . . . [the] illegally obtained and . . . improperly introduced [statement]." *Id.* at 223. Further, we conclude that even if Anson would have taken the stand in the absence of the illegally obtained confession, the State did not meet its burden in dispelling the "natural inference [] that no testimonial admission so damaging would have been made if the prosecutor had not already spread [Anson's] confession[] before the jury." *Id.* at 225–26.

¶ 16.　Therefore, we hold that the State has not demonstrated "that [Anson's] testimony was obtained 'by means sufficiently distinguishable' from the under-

lying illegality 'to be purged of the primary taint.' " *Id.* at 226 (quoting *Wong Sun v. United States,* 371 U.S. 471, 488 (1963)). As such, we hold that the State's underlying constitutional violation of Anson's right to counsel and the circuit court's error in not suppressing the tape-recorded statement was not harmless. We therefore remand for a new trial.

## III. STANDARD OF REVIEW

¶ 17. The question of the proper scope of a *Harrison/Middleton* hearing presents a question of law subject to de novo review. The second question is whether the State's introduction of Anson's illegally obtained confession "impelled" him to testify at trial. *Id.* at 224. The purpose of this inquiry is to determine whether Anson's testimony was the "fruit" of the State's unconstitutional procurement and use of Anson's confession to the California authorities, *see id.* at 222,[2] or whether the "testimony was obtained 'by means sufficiently distinguishable' from the underlying illegality 'to be purged of the primary taint.' " *Id.* at 226 (quoting *Wong Sun,* 371 U.S. at 488).

¶ 18. The question of whether evidence is the fruit of a prior constitutional violation or whether "the evidence was sufficiently attenuated so as to be purged of the taint" is one of constitutional fact. *State v. Hajicek,* 2001 WI 3, ¶ 25 n.7, 240 Wis. 2d 349, 620

---

[2] The Court in *Harrison v. United States,* 392 U.S. 219, 221 (1968), framed the issue as "whether the petitioner's trial testimony was the inadmissible fruit of the illegally procured confessions."

N.W.2d 781 (citing *State v. Anderson,* 165 Wis. 2d 441, 447–48, 477 N.W.2d 277 (1991)). "When we review a question of constitutional fact, we adopt the circuit court's findings of historical fact, unless they are clearly erroneous, but we independently apply those facts to the constitutional standard." *State v. Tomlinson,* 2002 WI 91, ¶ 39, 254 Wis. 2d 502, 648 N.W.2d 367.

## IV. ANALYSIS

¶ 19. In order to determine the proper scope of a *Harrison* hearing, we begin by examining the United States Supreme Court's decision in that case. In *Harrison,* the defendant was convicted on a charge of felony murder and his conviction was overturned on the basis that his confessions had been illegally obtained and were inadmissible. *Harrison,* 392 U.S. at 220. At retrial, the prosecution introduced the defendant's testimony from the prior trial, which placed the defendant at the scene of the crime with the murder weapon in hand. *Id.* at 221. The defendant objected, contending that his prior testimony had been induced by the prosecution's introduction of the inadmissible confessions. *Id.* The defendant was convicted. *Id.* On appeal, the United States Supreme Court considered "whether the petitioner's trial testimony was the inadmissible fruit of the illegally obtained confessions." *Id.*

¶ 20. The Court began its analysis by noting that generally, a defendant can waive his right against compulsory self-incrimination, even if his motivation in so testifying is the "strength of the lawful evidence adduced against him." *Id.* at 222. However, if the defendant testifies only after the prosecution introduces evidence obtained in an unlawful manner, "the same principle that prohibits the use of confessions so

procured also prohibits the use of any testimony impelled thereby—the fruit of the poisonous tree . . . ." *Id.*

¶ 21. The Court stated that it is irrelevant that the defendant made a tactical decision to testify in hopes of seeking acquittal: "The question is not *whether* the petitioner made a knowing decision to testify, but *why*. If he did so in order to overcome the impact of confessions illegally obtained and hence improperly introduced, then his testimony was tainted by the same illegality that rendered the confessions themselves inadmissible." *Id.* at 223. Thus, the Court stated that the pertinent question is "whether the petitioner's trial testimony was in fact impelled by the prosecution's wrongful use of his illegally obtained confessions." *Id.* at 224.

¶ 22. The Court placed the burden on the prosecution to demonstrate "that its illegal action did not induce his testimony." *Id.* at 225. The Court then concluded that the prosecution had failed to meet its burden:

> No such showing has been made here. In his opening statement to the jury, defense counsel announced that the petitioner would not testify on his own behalf. Only after his confessions had been admitted in evidence did he take the stand. It thus appears that, but for the use of his confessions, the petitioner might not have testified at all.

*Id.*

¶ 23. However, the Court placed an additional burden on the prosecution:

> But even if the petitioner would have decided to testify whether or not his confessions had been used, it does not follow that he would have admitted being at the scene of the crime and holding the gun when the fatal

shot was fired. On the contrary, the more natural inference is that no testimonial admission so damaging would have been made if the prosecutor had not already spread the petitioner's confessions before the jury. This is an inference the Government has not dispelled.

*Id.* at 225–26.

¶ 24. Therefore, the Court reversed the defendant's conviction because "[it] has not been demonstrated . . . that the petitioner's testimony was obtained 'by means sufficiently distinguishable' from the underlying illegality 'to be purged of the primary taint.' " *Id.* at 226 (quoting *Wong Sun,* 371 U.S. at 488).

¶ 25. In this case, the court of appeals in *Anson I* ordered that the case be remanded and an evidentiary hearing conducted in order to determine whether the State's procurement and use of Anson's confession to the California authorities, in violation of the Sixth Amendment, induced him to testify. *Anson I,* 258 Wis. 2d 433, ¶ 29. The parties dispute the proper scope of this hearing. Specifically, the State argues that the court of appeals' decision in *Anson II,* which held that the State could examine the defendant and his counsel, violates a defendant's Fifth and Sixth Amendment rights. *See Anson II,* 275 Wis. 2d 832, ¶ 12. Anson generally concurs in this statement, but asserts the State has no standing to raise these issues and that, in any event, Anson never invoked his constitutional rights. There is also a dispute as to the State's burden of proof at the hearing. Finally, the parties dispute whether the circuit court is entitled to rely on "intangibles," such as: 1) its determination of witness credibility based on testimony or events contained in the record; and 2) its own personal observations of courtroom activity and events not appearing in the record.

¶ 26. Addressing the State's first concern regarding the court of appeals' opinion in *Anson II,* we need not decide whether the State may call the defendant or his attorney during a hearing to determine whether the defendant was impelled to testify because we conclude a *Harrison* hearing is not an evidentiary hearing. Rather, we conclude that a *Harrison* hearing is a paper review, focusing on the entire record before the circuit court.

¶ 27. The notion of an evidentiary hearing comes from the court of appeals' decision in *Middleton,* 135 Wis. 2d at 323, where it directed the circuit court to "make an analysis under *Harrison, supra,* to find whether Middleton's testimony was impelled by those admissions." The *Middleton* court cited no authority for the proposition that an evidentiary hearing is required to undertake a *Harrison* analysis. This conclusion from *Middleton* seems to stem from its statement that "[w]hy [the defendant] testified is a fact which must be inferred from other evidence[,]" *id.* at 320 (citing *Harrison,* 392 U.S. at 226), and its apparent assumption that *why* the defendant testified is a historical fact. *See id.* at 317 ("We reemphasize that this court will not decide whether Middleton's testimony, was, in fact, so impelled . . . since the trial court must make that finding."); *id.* at 321 ("Whether Middleton in fact testified because the state used his confessions will be for the trial court to decide.").

¶ 28. However, the *Harrison* Court never stated that "[w]hy [the defendant] testified is a fact which must be inferred from other evidence." *Id.* at 320 (citing *Harrison,* 392 U.S. at 226). Rather, the Court in *Harrison* conducted an independent review of the record and concluded that the government did not prove that it did not induce the defendant to testify. *Harrison,* 392 U.S. at 225–26. This analysis is consistent with the way the

Court framed the issue: "[W]hether the petitioner's trial testimony was the inadmissible fruit of the illegally procured confessions." *Id.* at 221. As we discussed *supra,* a "fruits" analysis presents a question of constitutional fact. Simply put, at no point did the *Harrison* Court state that the question of whether the defendant's testimony was impelled was a question of historical fact.

¶ 29. Furthermore, at no point did the Court in *Harrison* provide that an evidentiary hearing was necessary to determine whether the defendant's testimony was impelled. The *Harrison* Court stated:

> "In evaluating the possibility that the erroneous introduction of [a] defendant's extrajudicial confession might have induced his subsequent testimonial confession, we must assess [the] defendant's reaction to the use of his confession at trial on the basis of the information then available to him . . . ."

*Id.* at 225 n.13 (quoting *People v. Spencer,* 424 P.2d 715, 720 (Cal. 1967)). However, in making this assessment in the case at hand, the Court never looked beyond the record. *See Harrison,* 392 U.S. at 225–26.

¶ 30. Therefore we can find no support in *Harrison* that an evidentiary hearing is needed in order to determine whether the defendant's testimony was impelled by the State's use of illegally obtained evidence. We conclude that because the ultimate conclusion as to whether the defendant was impelled to testify is a question of constitutional fact, the circuit court may not hold an evidentiary hearing when making a *Harrison* determination. Instead, we hold that a *Harrison* hearing is a paper review during which a circuit court makes findings of historical fact based on the record.

¶ 31. The circuit court should consider the *entire* record in " 'assess[ing] [the] defendant's reaction to the use of his confession at trial . . . .' " *Id.* at 225 n.13 (quoting *Spencer,* 424 P.2d at 720) (first alteration added). Although the circuit court should make findings of fact based on the entire record, we see no need for the court to take additional evidence. As such, we overrule the court of appeals' decision in *Middleton,* to the extent it holds that the circuit court may conduct a full evidentiary hearing when engaging in a *Harrison* analysis.

¶ 32. Further, we conclude that when making its findings of fact, the circuit court may make credibility determinations based on testimony and events appearing in the record.

> When, however, the trial court acts as the finder of fact it is the ultimate arbiter of both the credibility of the witnesses, and the weight to be given to each witness' testimony[.] *This is especially true because the trier of fact has the opportunity to observe the witnesses and their demeanor on the witness stand.*

*Pindel v. Czerniejewski,* 185 Wis. 2d 892, 898, 519 N.W.2d 702 (Ct. App. 1994) (citations omitted)(emphasis added).

¶ 33. However, we hold that the circuit court may not rely on its own personal observations of events not contained in the record. A circuit court that relies on its own personal observation of events not contained in the record as the basis for factual findings is essentially acting as a witness in the case by providing testimony.

Wisconsin Stat. § 906.05 (2003–04)[3] prohibits a judge from testifying in a trial as a witness at which the judge is presiding.

¶ 34. Therefore, while a circuit court may make credibility determinations based on material in the record when making its historical factual findings, it may not rely on its personal knowledge of events not appearing in the record. The circuit court thus may state that it found a witness' testimony at trial not credible or implausible in light of other testimony and evidence presented. However, the circuit court may not state, for example, its opinion the witness was being intimidated by the presence of several well-known gang members in the courtroom, *if the presence and behavior of these individuals was not documented in the record.*

¶ 35. Once a circuit court has made the requisite findings of historical fact based on the entire record, it must engage in a *Harrison* analysis and determine, as a matter of law, whether, based on those historical facts, the State proved that its prior constitutional violation

---

[3] All subsequent references to the Wisconsin Statutes are to the 2003–04 version. Wisconsin Stat. § 906.05 provides: "The judge presiding at the trial may not testify in that trial as a witness. No objection need be made in order to preserve the point." Compare Wis. Stat. § 902.01(2):

A judicially noticed fact must be one not subject to reasonable dispute in that it is any of the following:

(a) A fact generally known within the territorial jurisdiction of the trial court.

(b) A fact capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

did not impel the defendant to testify. We next address the issue of what burden of proof the State has at a *Harrison* hearing.

¶ 36. While *Harrison* clearly stated that the burden of proving the defendant was not impelled to testify is on the State, it did not describe what that burden was: "[W]hen the prosecution seeks to use testimony given after the introduction in evidence of a confession unlawfully obtained, it has the burden of proving that the defendant's testimony was not produced by the illegal use of his confession at trial." *Id.* at 225 n.12. Further, the court stated:

> It is, of course, difficult to unravel the many considerations that might have led the petitioner to take the witness stand at his former trial. But, having illegally placed his confessions before the jury, the Government can hardly demand a demonstration by the petitioner that he would not have testified as he did if his inadmissible confessions had not been used.

*Id.* at 224. That the *Harrison* Court did not address this issue is not surprising, as it was concerned with whether the defendant's allegedly impelled testimony could be used on retrial, not whether the defendant's conviction in the first trial should have been overturned because of the testimony. *See id.* at 221.

¶ 37. The State argues, relying on *United States v. Pelullo,* 173 F.3d 131, 137–38 (3d Cir. 1999), that the government must meet its burden by a preponderance of the evidence. The Third Circuit in *Pelullo* concluded that a preponderance of the evidence burden of proof was appropriate because *Harrison* resulted in an exclusionary rule and "[c]ourts almost invariably have required the government to prove only by a preponderance of the evidence that the causal link between the constitutional violation and the later-revealed evidence

is sufficiently weak or remote to merit admission of the evidence." *Id.* at 137 (collecting cases).

¶ 38. We disagree with the Third Circuit's decision in *Pelullo.* The principal problem with the court's analysis in *Pelullo* is that the cases it cites all focus on whether the evidence in question was properly obtained or admitted. *See id.* at 137–38. Here, the question is not whether Anson's testimony was properly admitted, but whether "by taking the stand, Anson waived his right against self-incrimination, thereby rendering any error [in the unconstitutional procurement and use of his California statement] harmless." *Anson I,* 258 Wis. 2d 433, ¶ 26. *See also id.,* ¶ 29. The test for harmless error "is ' "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " " *State v. Weed,* 2003 WI 85, ¶ 29, 263 Wis. 2d 434, 666 N.W.2d 485 (quoted sources omitted).

¶ 39. Turning back to *Harrison,* we note that the Court relied heavily upon, and quoted extensively from, the California Supreme Court's decision in *Spencer. See Harrison,* 392 U.S. at 223–25 & nn.12–13. The *Spencer* court explicitly utilized a harmless-error analysis when evaluating whether an illegally obtained confession induced the defendant to testify and repeat the incriminating statements:

> In determining the effect of defendant's extrajudicial confession upon the outcome of the instant trial, we must consider the likelihood that it contributed to the verdict by *inducing* the defendant to admit his guilt in open court.
>
> . . . .
>
> To overcome the likelihood that the erroneous

> introduction of defendant's extrajudicial confession impelled his testimonial one, the State bears the burden of showing that the causative link between the two confessions had been broken. "[T]he beneficiary of a constitutional error [must] prove *beyond a reasonable doubt* that the error complained of did not contribute to the verdict obtained."

*Spencer,* 424 P.2d at 719, 722 (emphasis in original)(quoting *Chapman v. California,* 386 U.S. 18, 24 (1967)). In fact, *Harrison* itself quoted *Chapman* immediately after stating that the burden to prove the defendant's testimony was not impelled belonged to the State. *Harrison,* 392 U.S at 225 n.12.

¶ 40. Therefore, we conclude that when a defendant alleges that his trial testimony was impelled by the State's illegal introduction of evidence unconstitutionally obtained, the State bears the burden of proving beyond a reasonable doubt that the prior constitutional violation did not impel the defendant's testimony.

¶ 41. Having set forth the appropriate scope of a *Harrison* hearing, we now proceed to determine whether the State proved beyond a reasonable doubt that its illegal procurement and improper use of Anson's statement to the California authorities induced him to testify. At the outset, the State argues that the court of appeals' remand instructions in *Anson I* mischaracterized the *Harrison* analysis by stating that the circuit court was to determine if "a link in fact exists between the State's constitutional violation and Anson's subsequent decision to take the stand and repeat the inculpatory statements[.]" *Anson I,* 258 Wis. 2d 433, ¶ 29. We disagree.

¶ 42. As noted, the *Harrison* Court set forth a two-pronged test to determine whether a defendant's testimony was impelled by the government's improper use of prior incriminating statements. First, it must be determined whether the defendant took the stand in order to overcome the impact of the illegally obtained statements. *Harrison,* 392 U.S. at 223. In determining whether this part of the analysis had been satisfied in the case before it, the *Harrison* Court stated: "It thus appears that, *but for* the use of his confessions, the petitioner might not have testified at all." *Id.* at 225 (emphasis added). Next, even if the defendant would have taken the stand in the absence of the use of his incriminating statements, the court must determine whether the defendant would have repeated the incriminating statements "if the prosecutor had not already spread the petitioner's confessions before the jury." *Id.* at 225–26. If the State fails to prove either prong of the test, then it follows that the State has failed to demonstrate that the defendant's testimony "was obtained 'by means sufficiently distinguishable' from the underlying illegality 'to be purged of the primary taint.' " *Id.* at 226 (quoting *Wong Sun,* 371 U.S. at 488). Given the above language from *Harrison,* including its use of the "but for" test, we cannot conclude that the court of appeals' remand directions in *Anson I* improperly stated the *Harrison* analysis. The courts of appeals' statement that the circuit court must determine whether "a link in fact exists between the State's constitutional violation and Anson's subsequent decision to take the stand and repeat the inculpatory statements," *Anson I,* 258 Wis. 2d 433, ¶ 29, was merely a shorthand method of summarizing both prongs of the *Harrison* analysis.

¶ 43. Addressing the first of the two *Harrison* prongs, we hold that the State failed to demonstrate beyond a reasonable doubt that Anson did not take the stand in order to overcome the effect of the illegally obtained and improperly introduced statements he made to the California authorities.

¶ 44. Anson's statement to the California authorities was tape recorded while he sat in a police vehicle.[4] On the tape, Anson admitted to the California authorities that the victim "had some grounds" for one of the touching allegations. Anson admitted that he touched the alleged victim on the outside of her clothes, over her vagina, but that the victim placed his hand there. Anson stated that when she did this, he "froze." Anson also admitted that he later lied to his wife about the incident by telling her that the victim placed his hand on her breast. He stated that he lied to his wife in order to protect her. Furthermore, he stated that the touching incident lasted three minutes, although, due to the poor quality of the recording, it is unclear whether he stated that the entire incident of him getting up, going downstairs, touching the victim, and returning to bed lasted three minutes, or whether he stated that he "froze" for three minutes when the victim moved his hand over her genitalia.

¶ 45. Following the denial of his motion to suppress the statement he gave to the California authorities, Anson filed a petition for leave to appeal and a motion to stay the trial pending appeal. His petition stated: "Admission of the statement will strategically

---

[4] Due to the fact that the tape recorder was placed behind Anson's seat and the air conditioner was running, several portions of the tape are inaudible.

force the defendant to testify despite his right of silence." The court of appeals denied his request. *Anson II*, 275 Wis. 2d 832, ¶ 5.

¶ 46. During opening statements, the State discussed at length Anson's tape-recorded statement:

> Part of what you are going to hear on the tape—part of what you are going to hear the defendant say is, well, when the officer asks him why would [the victim] say these things, he said she had some grounds for these allegations, and he tells his side of it, at least a partial version of it, and he totally denies anything happening on the porch. . . . But he does talk about the couch incident when everybody else had gone to bed. He said that he went downstairs to get a drink of water; he noticed [the victim] was awake, and he walked up to her by the couch and he said how he was stroking her hair, and the defendant said to the officer, well, I had put my hand on her thigh, and then she took my hand and she placed it on her vagina. *And he tells the officer that I froze for three minutes* and I didn't know what to do when this 13 year old girl had taken my hand and put it on her vagina. And in that statement the defendant admits that he lied to his wife when finally this come out, and he didn't tell anybody either for a couple of years; that he told his wife that [the victim] had taken his hand and placed it on her breast, not her vagina.

(Emphasis added.)

¶ 47. During Anson's opening statement, his attorney put forth the theory that the victim's allegations of abuse were raised by her mother as a way to gain a tactical advantage in her divorce proceeding with the victim's father. His attorney also discussed Anson's tape-recorded statement and stated that Anson admitted the entire couch episode lasted three minutes but that his hand was on the victim's genitalia only for a

couple of seconds. Anson's attorney stated that Anson never admitted to placing his hand on the victim for three minutes but that the officers repeatedly attempted to get him to admit this. Anson's attorney also stated that Anson would testify that he lied to his wife because he didn't think his wife would believe him and that if he told her the entire truth she would become very angry with the victim.

¶ 48. At trial, the jury heard Anson's tape-recorded statement to the California authorities. The State also published two separate copies of a transcript of the tape, with different versions of corrections one of the officers made. The officer testified that during the interview Anson told him his hand was placed on the victim's genitalia for three minutes.

¶ 49. Anson testified in conformity with counsel's opening statement. He testified that he woke up, went downstairs for a glass of water, saw the victim was awake, sat down next to her, asked her what was the matter, and that she placed his hand on top of her clothing over her vagina. Anson testified that the reference to three minutes on the audiotape was meant to encompass the entire episode of getting up, going downstairs, and returning to bed. He stated his hand was only on the victim for a second. Finally, he stated that he had lied to his wife because he was unsure if she would believe him and that he was afraid she would be in an extreme rage against the victim if he told her what actually happened.

¶ 50. In addition, the defense, through cross-examination of the State's witnesses, made allegations that the victim's mother encouraged the victim to make false accusations in order to gain a tactical advantage in her ongoing custody dispute with the victim's father.

¶ 51. The State argues that Anson would have testified regardless of the California statement because its other witnesses, including the victim, were very credible and gave very compelling testimony. The State notes that Anson's attorney announced during opening statements that he would testify. The State also argues that Anson would have taken the stand because his testimony at trial went beyond explaining the California statement and that he testified as to his past and the family's history. Finally, the State argues that Anson would have testified anyway because he needed to not only explain the third touching incident but also deny the first two alleged incidents.

¶ 52. While the State sets forth a strong argument, there are several countervailing considerations. First, the State announced to the jury that it would introduce Anson's statement to the California authorities before Anson's counsel made his opening statement to the jury. Second, Anson's petition for leave to appeal and for a stay of the trial pending appeal supports Anson's position that he testified because of the State's use of the California statement. Further, the State relied heavily upon the tape-recorded statement during its opening statement and the evidentiary phase of the trial. In addition to hearing the audiotape, the jury was presented with two different transcripts of the taped statement. Moreover, the State presented the tape recording as indicating that Anson had left his hand on the victim's vagina for three full minutes. It also emphasized that Anson lied to his wife. Given the State's representations, Anson needed to take the stand and explain his statement to the California authorities, particularly his reference to "three minutes" in relation to the touching episode.

¶ 53. In addition, while one of the defense's theories was that the victim initiated the touching on the couch and that the touching was not intended, Anson had an entirely independent theory of the case. As noted, one of the defense strategies was to allege that the victim's mother had fabricated the assaults as a means of gaining a tactical advantage during her custody dispute with the victim's father. Finally, aside from Anson's own testimony, the State had no lawfully obtained, independent evidence to corroborate the incriminating statement in California. Thus, this is not a case where the illegal evidence was duplicative or cumulative of other evidence. Had the State not introduced the California evidence, Anson could have presented an effective defense without testifying.

¶ 54. Viewing the trial proceedings in context, we cannot conclude that the State proved beyond a reasonable doubt that Anson would have testified despite the introduction of his incriminating statements to the California authorities, regardless of how credible and compelling the testimony was from the State's witnesses. Further, even if we were to conclude that the State had met this burden, it has not demonstrated that had Anson taken the stand, he would have repeated the damaging admissions.

¶ 55. We agree with the court of appeals in *Anson II*:

> Even if Anson would have chosen to testify, it is unlikely that he would have said that the victim "may have some grounds for the allegation," or referenced a three-minute time frame for the touching episode, or admitted lying to his wife about the incident. The State has not therefore, defeated the "natural inference" that "no testimonial admission so damaging would have

been made if the prosecutor had not already spread the petitioner's confessions before the jury."

*Anson II,* 275 Wis. 2d 832, ¶ 23 (quoting *Harrison,* 392 U.S. at 225–26).

¶ 56. We hold that the State has not demonstrated that "the petitioner's testimony was obtained " 'by means sufficiently distinguishable' from the underlying illegality 'to be purged of the primary taint.' " *Harrison,* 392 U.S. at 226 (quoting *Wong Sun,* 371 U.S. at 488). As such, we hold that Anson's testimony was impelled by the State's underlying constitutional violation. Thus, we hold that the circuit court's error in failing to suppress Anson's tape-recorded statement, which violated his Sixth Amendment rights, was not harmless. Therefore, we affirm the decision of the court of appeals and remand for a new trial.[5]

## V. CONCLUSION

¶ 57. We hold that a *Harrison* hearing is not an evidentiary hearing and overrule the court of appeals' decision in *Middleton* to the extent it held a circuit court may take additional evidence at such a hearing. We hold that a *Harrison* hearing is a paper review during which a circuit court makes findings of historical fact based on the record. The circuit court should make findings of historical fact based on the *entire* record. While a circuit court may make credibility determinations based on material in the record when making its historical factual findings, it may not rely on its personal knowledge of events not appearing in the record.

---

[5] On retrial, use of Anson's statement is limited to the parameters set forth in *Harris v. New York,* 401 U.S. 222 (1971).

661

¶ 58. Once a circuit court has made the requisite findings of historical fact, it must determine, as a matter of law, whether the State proved beyond a reasonable doubt that its prior constitutional violation did not impel the defendant to testify under the standards set forth in *Harrison.* A *Harrison* analysis is a two-part inquiry. First, the circuit court must consider whether the defendant testified "in order to overcome the impact of [statements] illegally obtained and hence improperly introduced[.]" *Id.* at 223. Second, even if the court concludes that the defendant would have taken the stand, it must determine whether the defendant would have repeated the damaging testimonial admissions "if the prosecutor had not already spread the petitioner's confession before the jury." *Id.* at 225–26.

¶ 59. We conclude that the State has not proved beyond a reasonable doubt that Anson did not take the stand "in order to overcome the impact of . . . [the] illegally obtained and . . . improperly introduced [statement]." *Id.* at 223. Further, we conclude that even if Anson would have taken the stand in the absence of the illegally obtained confession, the State did not meet its burden in dispelling the "natural inference [] that no testimonial admission so damaging would have been made if the prosecutor had not already spread [Anson's] confession[] before the jury." *Id.* at 225–26.

¶ 60. Therefore, we hold that the State has not demonstrated "that [Anson's] testimony was obtained 'by means sufficiently distinguishable' from the underlying illegality 'to be purged of the primary taint.' " *Id.* at 226 (quoting *Wong Sun,* 371 U.S. at 488). As such, we hold that the circuit court's error in failing to suppress Anson's tape-recorded statement, which violated his Sixth Amendment rights, was not harmless. We there-

fore affirm the court of appeals and remand for a new trial.

*By the Court.*—The decision of the court of appeals is affirmed.