KONENKAMP, Justice
(dissenting).
[¶ 68.] If we are to preserve the integrity of our juvenile justice system, we cannot support law enforcement tactics that mislead children into believing that waiving their Miranda rights is “not a big deal at all.” Nor can we encourage deceiving parents about the true reason police seek to question their children. Our Court today upholds these practices. And nowhere in its decision to reverse does the Court explain how the trial court erred in ruling inadmissible a statement in which these tactics were used against a fifteen year old and her mother.
[¶ 69.] The burden rests on the State to show that an accused “knowingly and intelligently waived [her] privilege against self-incrimination and [her] right to retained or appointed counsel.” Miranda v. Arizona, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966); see State v. Tuttle, 2002 S.D. 94, ¶ 9, 650 N.W.2d 20, 26. Proof only that a person in custody was given Miranda warnings and made an uncoerced statement, “standing alone, is insufficient to demonstrate ‘a valid waiver[.]’” Berghuis v. Thompkins, 560 U.S. 370, 384, 130 S.Ct. 2250, 2261, 176 L.Ed.2d 1098 (2010). The State must make the further showing that the accused understood and gave up these rights. Id. We take special care with children. As our Court said in State v. Caffrey, “[a] juvenile’s constitutional right against self-incrimination should be afforded additional protection. If counsel is not present when an admission is obtained, a court must take great care to assure that the juvenile’s confession was voluntary ‘in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright, or despair.’ ” 332 N.W.2d 269, 272 (S.D.1983) (quoting In re Gault, 387 U.S. 1, 55, 87 S.Ct. 1428, 1458, 18 L.Ed.2d 527 (1967)) (internal citation omitted).
Use of Deception Against Parent and Child
[¶ 70.] When the officers called Maricela Nicolasa Diaz’s mother, they knew Mar *167 icela had been lying about her age and identity. They knew that she had been involved in a prior altercation with the victim, and they knew that she was seen with the victim just hours before her death. Yet they did not tell the mother the real reason they wanted to talk to her daughter, only that there was a “separate investigation” in South Dakota. They told the mother that “it is possible that [Maricela] is a witness to what happened,” without saying what it was that happened. At the end of the conversation, Detective Soto told the mother, “I appreciate your permission to talk with the girl and if you would like, you can talk with her later.” They never told the mother that they would then be seeking to have Maricela waive her Miranda rights in connection with a murder.
[¶ 71.] Our Court excuses Detective Soto’s misrepresentations because he testified that he personally believed Maricela was only a possible witness at that time. The trial court found that Soto’s misrepresentation was unintentional because he “had limited information about the facts[.]” But the court found nonetheless that “the investigation had by then established that [Maricela] was far more than a ‘possible witness.’” Two other investigators knew this, Detectives Reinesch and Russell, and one officer’s knowledge of a fact is generally imputed to the other investigating officers. See, e.g., State v. Middleton, 135 Wis.2d 297, 399 N.W.2d 917, 924 (Wis.App.1986) (citing cases), overruled on other grounds by State v. Anson, 282 Wis.2d 629, 698 N.W.2d 776 (2005). Without this rule, one investigator, “unaware” of the details, could freely make inaccurate or misleading statements without any consequence.
[¶ 72.] More conspicuously, Detective Soto deliberately withheld from the mother that her daughter was to be questioned about a murder. He later testified, “I don’t tell people what the investigation is about.” And, as Maricela’s hours-long interrogation evolved, the officers never called the mother back to inform her that her child’s witness status had changed to that of a suspect. The trial court concluded: “It is difficult to imagine how a parent can meaningfully consent to her child being questioned in a serious criminal investigation, without knowing that she is indeed a suspect in the case rather than merely a ‘potential witness.’” Our Court gives this no import because our statutes do not strictly require parental consent.[21] That misses the point.
[¶ 73.] Why is the police deception of the mother crucial here? Because, whether intentional or not, this deception — withholding from the mother the real reason they wanted to talk to her daughter — set the stage for using the mother’s permission to convince Maricela to speak to the officers. Fortified with the mother’s uninformed consent, they plied Maricela by saying repeatedly that her mother said it was okay to talk to her. Here is Detective Reinesch (speaking in English): “I spoke with your mom, Irma, a little while ago and she said it was okay to talk to you.” And Detective Soto (speaking in Spanish) reinforced the same ploy: “I spoke with your Mom, Irma, a little while ago and she said it was okay to talk to you.” And again later, Detective Soto: “Do you want to talk to us about the events? Yes or no? Because your — I already spoke to your mom and she said that we can talk to you about what happened and all the events *168 with the family, with Alexander. Do you want to talk to us?” Our Court brushes past this obvious tactic that when the officers asked Maricela if she wanted to “talk,” they coupled it with the assurance that her mother said “it was okay to talk to you.”
[¶ 74.] Maricela had turned fifteen only two months before. She had telephoned her mother earlier that day, as she occasionally did, this time saying that Salgado (her adult boyfriend) had physically abused her. Now she was being told that her mother thought it was okay for her to talk to the police. In fact, immediately after Detective Soto’s remarks, Maricela agreed to answer the officers’ questions. Children are more susceptible to police interrogation techniques, as Justice Soto-mayor explained: “It is beyond dispute that children will often feel bound to submit to police questioning when an adult in the same circumstances would feel free to leave.” J.D.B. v. North Carolina, — U.S. -, 131 S.Ct. 2394, 2398-99, 180 L.Ed.2d 310 (2011). Thus, the principle we held important in State v. Horse — that children need an opportunity for adult or legal guidance before deciding to relinquish their fundamental rights — was twisted here to create the suggestion that Maricela’s mother thought it was okay for her to give up her rights.[22] See 2002 S.D. 47, ¶¶ 17, 27, 644 N.W.2d 211, 221, 225. But the deceptive tactics did not end there.
[¶ 75.] Just before giving Maricela her Miranda rights, Detective Reinesch told her, “[T]here’s a protocol that I’ve gotta go through first, okay? Not a big deal at all and we’ll get through this and we’ll getcha takin’ care of.” In pardoning this blatant minimization of constitutional rights, the Court declares, “it is likely [Maricela] did not fully understand the word ‘protocol,’ and what Reinesch was referring to as ‘not a big deal.’ ” Two law enforcement officers testified that from their observations and her responses, Maricela appeared to understand everything they spoke to her in English. But the Court seizes on a remark Maricela made to Detective Soto — “I don’t understand anything” — as a reason to isolate Detective Reinesch’s deceptions. A review of the interrogation transcript, however, reveals that she responded appropriately in English to each of the numerous questions put to her in English. Detective Soto observed that she was “talking just fine” in English with Rein-esch. And even if she did not know the word “protocol,” how does that prove she did not understand “not a big deal at all”? From the testing done with her, she demonstrated up to a third grade level of spoken English comprehension. What first, second, or third grader does not understand the meaning of no big deal ?
[¶ 76.] Our Court concedes that these “prefatory remarks downplaying the importance of [Maricela’s] Miranda rights” were improper, but, after this passing reproach, it still upholds them. It accuses Maricela of wanting “it both ways,” yet the Court at once both condemns and defends these improper police tactics. Such practices would be questionable even when used against a seasoned adult suspect. See, e.g., Ross v. State, 45 So.3d 403, 428 (Fla.2010). Maricela, at age fifteen, had no experience in the criminal justice system. Her only contact with courts was as a child in need of supervision. She had never before been given a Miranda advisement. She had never been represent *169 ed by a lawyer. Yet the Court, citing her puerile attempts to mislead the officers, deems her to have sufficient understanding to waive her Miranda rights, as if being a dislocated child of an illegal immigrant, a sexually and physically abused runaway, an emotionally unstable, immature, and conduct-disordered youth, somehow made her better capable of understanding the ominous consequences of relinquishing her fundamental rights.
[¶ 77.] This error, presuming adult capabilities from adolescent maladjustment, is the type of error the United States Supreme Court warned against: “It would be ironic if these assumptions that we so readily make about children as a class— about their inherent differences from adults in their capacity as agents, as choosers, as shapers of their own lives — were suddenly unavailable” because a child emulates dysfunctional adult behavior. See Thompson v. Oklahoma, 487 U.S. 815, 825 n. 28, 108 S.Ct. 2687, 2693 n. 23, 101 L.Ed.2d 702 (1988).
[¶ 78.] As it might serve to buttress its claim that Maricela knowingly and intelligently waived her Miranda rights, the Court attempts to depict her as being adept beyond her years.[23] In the trial court’s decision, however, it concluded that she was “an emotionally unstable teenager ... immature for her age,” and her futile attempts to deceive law enforcement officers displayed “naive immaturity.” Expert opinion supported this view. Dr. David Bean, an evaluating psychiatrist, concluded that “her ‘mental maturity’ is much less than one would expect from a 15-year-old child in our society.” This Court’s strained effort to portray Maricela as other than the troubled and immature child the police interrogated serves to demonstrate how tenuous its decision is.
[¶ 79.] In another ploy to downplay the nature of Maricela’s Miranda rights, Detective Reinesch, as the circuit court found, “inaccurately summarized those rights by focusing solely on the right to remain silent[.]” Here again is Detective Reinesch:
Okay and — and—basically—basically what it is, Maricela, is, is you have the right to-to not tell me whatever you don’t wanna tell me. If you don’t wanna tell me somethin’, you don’t have to, okay? That’s basically you know, what it is? You know, I’d like to sit down and have a conversation with ya, you know, especially about the stuff that’s been goin’ on from, you know, from Indiana and stuff like that, you know, as far as you know, you callin’ mom today and stuff like that. That’s what I’d like to talk to you about, okay? But you have the right to not talk to me, okay? That’s basically what I’m reading to ya. Do — do you understand that?
Maricela: So I don’t need — I stay silent also?
Reinesch: You — you can if you want to. Do you — do you — do you wanna have a conversation with me? That’s basically what I’m talkin’ about, Maricela.
This misdirection along with the “mischar-acterization” of rights, as the trial court called it, made no mention of the right to first consult with a lawyer or the continuing right to stop and consult with one. It centered on whether Maricela wanted to “have a conversation” without mentioning the need to first waive the rights Miranda afforded her. Our Court overlooks the rule that a Miranda waiver is only valid if it “was the product of a free and deliberate choice rather than intimidation, coercion, *170 or deception.” Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1185, 1141, 89 L.Ed.2d 410 (1986) (emphasis added).
[¶ 80.] Maricela never explicitly waived her Miranda rights, but the Court nonetheless finds an implied waiver. Finding such a waiver here sets a regrettable precedent in juvenile law. Maricela was repeatedly asked whether she wanted merely “to talk” to the officers. Detective Soto: “And do you want to talk to us about the events that we — yes or no?” Detective Soto: “Do you want to talk to us about the events? Yes or no? ... Do you want to talk to us?” Detective Soto: “First of all, do you want to talk, yes or no?” And finally, Detective Soto: “Okay, now, do you want to continue speaking in — in English for [Reinesh’s] benefit? Or do you wanna speak in Spanish?” No mention here about “waiving” her rights. She was never asked to waive them. Wanting to talk and wanting to waive one’s Miranda rights before talking are separate matters the Court seeks to merge, and Maricela, being immature and inexperienced, would not likely have grasped the distinction. This is especially true given the deceptions and rights minimization used against her. As the trial court concluded, “the manner used first to minimize these rights and then to explain them in a way that excluded reference to [Maricela’s] right to the continuing presence of an attorney, and finally to ask simply if she wished to talk with them in English or Spanish, rather than whether she wished to ‘waive these rights and talk to us’ or some similar question” made any waiver untenable. Our Court absolves all these improper tactics as falling short of a necessary “level of misconduct[.]”
[¶ 81.] Lastly, the trial court concluded that “[l]aw enforcement’s failure to comply with the provisions of SDCL 26-7A-13, [SDCL] 26-7A-13.1, [SDCL] 26-7A-15, and [SDCL] 26-7A-17,” requiring “immediate” notice to the juvenile court or intake officer of a child taken into custody, was also a factor “weighing against a knowing and voluntary waiver of [Maricela’s] Miranda rights.”
[¶ 82.] Maricela was on “unequal footing” with her police interrogators. See Gallegos v. Colorado, 370 U.S. 49, 54, 82 S.Ct. 1209, 1213, 8 L.Ed.2d 325 (1962). Juveniles “often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them.” — U.S. at -, 131 S.Ct. at 2403 (citation omitted). To compensate for youth and immaturity, we examine “the juvenile’s age, experience, education, background, and intelligence, and into whether [she] has the capacity to understand the warnings given [her], the nature of [her] Fifth Amendment rights, and the consequences of waiving those rights.” Fare v. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979). As the trial court correctly found here, in its exhaustive seventy-nine page decision, these factors weighed against finding a knowing and intelligent waiver.
Children Should Not be Treated Like Adults
[¶ 83.] We know that juveniles “may lack the sophistication, knowledge, or maturity to understand the ramifications of an admission.” In re J.M.J., 2007 S.D. 1, ¶ 14, 726 N.W.2d 621, 627-28. Indeed, our laws prohibit children from making potentially life-changing decisions they are not yet ready to make in such areas as contract formation, blood donation, school attendance, marriage, and alcohol consumption. See SDCL 26-2-1 (contract formation); SDCL 26-2-7 (blood donation); SDCL 13-27-1 (school attendance); SDCL 25-1-9 (marriage); SDCL 35-9-1, -2.3 (alcohol consumption). The United States Supreme Court has consistently *171 recognized that “[t]he law has historically reflected the same assumption that children characteristically lack the capacity to exercise mature judgment and possess only an incomplete ability to understand the world around them.” J.D.B., — U.S. at -, 1B1 S.Ct. at 2403. These concepts underlie the entire basis for our separate juvenile court system. Yet the “special care” we are required to take in scrutinizing juvenile cases will remain illusory today. See Gallegos 370 U.S. at 53, 82 S.Ct. at 1212.
[¶ 84.] This decision will surely influence how law enforcement officers handle children in the future. Trickery and deception may perhaps have their place in seeking admissions from adult suspects, but not with children. Horse, 2002 S.D. 47, ¶ 16, 644 N.W.2d at 220. Will South Dakota no longer recognize the difference? In the words of the trial court, “[i]t is difficult to identify any meaningful way in which investigators treated [this fifteen-year-old] differently from an adult....” These same words can be echoed here as well: it is difficult to identify any meaningful way in which our Court treats this child differently from an adult.
[¶ 85.] Judicial decision making is a profoundly human undertaking. And being human, our decisions often tread on the edge of uncertainty. We bear a moral obligation, therefore, to never forget that we may be mistaken. That is why we afford, especially with children, “every reasonable presumption against waiver” of constitutional rights. See Brewer v. Williams, 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977). These presumptions were not followed here; they were merely swept aside, and I dissent.

. If police in South Dakota can question children without their parents’ consent or even their knowledge about the subject of the interrogation, one must wonder how serious a "level of impropriety” or "level of misconduct,” to use this Court's terms, will be tolerated in future secret interrogations.

. The circuit court concluded "that in asking [Maricela] whether she wished to speak with them, investigators invoked the consent her mother gave them. The problem is ... the consent mother gave was for police to question her daughter as a 'possible witness,' rather than for the real purpose for which authorities wanted to question her.”

. The psychologist's opinion that Maricela is "oppositional, resistant, sneaky, underhanded,” etc., cautioned that these were merely ‘‘possible personality trait[s ]” shown in her psychological testing. (Emphasis added.)